**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNIVERSITY OF CALIFORNIA STUDENT ASSOCIATION, | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-00354-RDM |
| DENISE CARTER, in her official capacity as Acting Secretary of Education, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................1

    I.      The United States DOGE Service .................................................................1

    II.     The DOGE Team at the Department of Education .......................................2

    III.    This Litigation ..............................................................................................3

STANDARD OF REVIEW ......................................................................................................4

ARGUMENT ...........................................................................................................................5

    I.      Plaintiff's Suit Improperly Attacks the President's Article II Powers..........5

    II.     Plaintiff Has Not Shown a Substantial Likelihood of Standing ...................6

        a.      The Association's individual members have not shown standing......7

        b.      Participation of individual members is required.................................11

    III.    A Temporary Restraining Order Is Unwarranted..........................................12

        a.      Plaintiff has not shown irreparable injury .........................................12

        b.      Plaintiff is not likely to succeed on the merits ..................................14

            i.      Plaintiff cannot obtain relief under the APA............................14

                  1.     Plaintiff has not identified final agency action...........15

                  2.     Plaintiff has an adequate alternative remedy .............18

                        a.     Privacy Act of 1974....................................19

                        b.     Internal Revenue Code ...............................21

            ii.     Plaintiff has not alleged a likely violation of any statute .......22

                  1.     The individuals advancing the Department of Education's DOGE agenda are federal employees..........................22

                  2.     Plaintiff is not likely to succeed in establishing a Privacy Act violation ...................................................................26

                  3.     Plaintiff is not likely to succeed in establishing a violation of the Internal Revenue Code....................................................28

            iii.    Plaintiff is not likely to establish that Defendants have acted arbitrarily and capriciously ...................................................29

        c.      The balance of the equities favors Defendants...................................30

    IV.   The Scope of Relief Sought Is Overbroad and Inadequately Specific.........31

CONCLUSION........................................................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama,*
    953 F. Supp. 2d 213 (D.D.C. 2013) ......................................................................................14

*Abbott Laby's v. Gardner,*
    387 U.S. 136 (1967) ............................................................................................................15

*Agbanc Ltd. v. Berry,*
    678 F. Supp. 804 (D. Ariz. 1988)........................................................................................21

*Azar v. Allina Health Servs.,*
    587 U.S. 566 (2019) ............................................................................................................24

*Barclift v. Keyston Cred. Servs.,*
    585 F. Supp. 3d 748 (E.D. Pa. 2022) ...................................................................................9

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................................................15

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ............................................................................................................18

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ............................................................................................................18

*Cal. Cmtys. Against Toxics v. EPA,*
    934 F.3d 627 (D.C. Cir. 2019)............................................................................................15

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ............................................................................................................31

*Cell Assocs., Inc. v. NIH,*
    579 F.2d 1155 (9th Cir. 1978) ......................................................................................20, 21

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006)............................................................................................13

*Ciralsky v. CIA,*
    689 F. Supp. 2d 141 (D.D.C. 2010) ...................................................................................25

*City of New York v. DOD,*
    913 F.3d 423 (4th Cir. 2019) .........................................................................................16, 17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .........................................................................................................7, 10

*Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*,

    603 U.S .799 (2024) ...................................................................................................24

*Council on Am.-Islamic Rels. v. Gaubatzi*,

    667 F. Supp. 2d 67 (D.D.C. 2009)...............................................................................8

*Dew v. United States*,

    192 F.3d 366 (2d Cir. 1999)........................................................................................18

*Doe v. Stephens*,

    851 F.2d 1458 (D.C. Cir. 1988)..................................................................................20

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*,

    396 F.3d 1265 (D.C. Cir. 2005)..................................................................................18

*Elec. Privacy Inf. Ctr. v. Pres. Advisory Comm'n on Election Integrity*,

    878 F.3d 371 (D.C. Cir. 2017).......................................................................................6

*Elec. Privacy Inf. Ctr. v. U.S. Dep't of Comm.*,

    928 F.3d 95 (D.C. Cir. 2019).........................................................................................7

*Farst v. AutoZone, Inc.*,

    700 F. Supp. 3d 222 (M.D. Pa. 2023).........................................................................9

*FAA v. Cooper*,

    566 U.S. 284 (2012) ............................................................................................. 19, 20

*Farst v. AutoZone, Inc.*,

    700 F. Supp. 3d 222 (M.D. Pa. 2023).........................................................................9

*FDA v. All. for Hippocratic Med.*,

    602 U.S. 367 (2024) ................................................................................................ 7, 10

*Freeman v. EPA*,

    No. 02-0387, 2004 WL 2451409 (D.D.C. Oct. 25, 2004) .....................................25

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,

    460 F.3d 13 (D.C. Cir. 2006)......................................................................................14

*Garcia v. Vilsack*,

    563 F.3d 519 (D.C. Cir. 2009)....................................................................................18

*Genesis Cap., LLC v. Lauravin Luxury Apts. Homes*,

    Civil Action No. 23-795 (JEB) (D.D.C. May 15, 2023) ........................................14

*Gill v. Whitford*,

    585 U.S. 48 (2018) ......................................................................................................31

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) ...................................................................................................31

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  920 F.3d 1 (D.C. Cir. 2019) ..........................................................................................4

*Henkell v. United States,*
  No. 96-cv-2228, 1998 WL 41565 (E.D. Cal. Jan. 9, 1998) .........................................9

*Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.,*
  48 F.4th 1236 (11th Cir. 2022) ....................................................................................9

*I.C. v. Zynga, Inc.,*
  600 F. Supp. 3d 1034 (N.D. Cal. 2022) .......................................................................9

*In re OPM Data Sec. Breach Litig.,*
  928 F.3d 42 (D.C. Cir. 2019) ................................................................................. 9, 11

*Jones v. U.S. Dep't of Hous. & Urban Dev.,*
  No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845 (E.D.N.Y. May 29, 2012) ...............18

*Judicial Watch v. Dep't of Energy,*
  412 F.3d 125 (D.C. Cir. 2005) ....................................................................................25

*Laible v. Lanter,*
  91 F.4th 438 (6th Cir. 2024) .......................................................................................25

*Lewis v. Casey,*
  518 U.S. 343 (1996) ...................................................................................................31

*Lujan v. Nat'l Wildlife Federation,*
  497 U.S. 871 (1990) ............................................................................................ 16, 17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ...................................................................................................22

*Mdewakanton Sioux Indians of Minn. v. Zinke,*
  255 F. Supp. 3d 48 (D.D.C. 2017) ..............................................................................14

*Mount v. U.S. Postal Serv.,*
  79 F.3d 531 (6th Cir. 1996) ........................................................................................25

*Munaf v. Geren,*
  553 U.S. 674 (2008) .....................................................................................................4

*Murthy v. Missouri,*
  603 U.S. 43 (2024) .....................................................................................................10

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
No. 1:25-cv-239, 2025 WL 314433 (D.D.C. Jan. 28, 2025)........................................................4

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................................30

*Norton v. S. Utah Wilderness Alliance*,
542 U.S. 55 (2004) ..............................................................................................15, 16, 17

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
930 F.3d 519 (D.C. Cir. 2019)........................................................................................13

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
48 F. Supp. 3d 87 (D.D.C. 2014)......................................................................................5

*Parks v. IRS*,
618 F.2d 677 (10th Cir. 1980) ........................................................................................20

*Poss v. Kern*,
No. 23-cv-2199, 2024 WL 4286088 (D.D.C. Sept. 25, 2024) .........................................20

*Pub. Citizen Health Rsch. Grp. v. Acosta*,
363 F. Supp. 3d 1 (D.D.C. 2018)......................................................................................4

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ..........................................................................................................6

*Rimmer v. Holder*,
700 F.3d 246 (6th Cir. 2012) ............................................................................................6

*Sampson v. Murray*,
415 U.S. 61 (1974) ..........................................................................................................12

*Schmidt v. Lessard*,
414 U.S. 473 (1974) ........................................................................................................31

*Seila Law, LLC v. CFPB*,
591 U.S. 197 (2020) ......................................................................................................5, 6

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018)......................................................................................15

*Sussman v. U.S. Marshal Serv.*,
494 F.3d 1106 (D.C. Cir. 2007)......................................................................................20

*Tanner-Brown v. Haaland*,
105 F.4th 437 (D.C. Cir. 2024) ........................................................................................9

*Thompson v. Trump*,
  590 F. Supp. 3d 46 (D.D.C. 2022)..................................................................................9

*TransUnion v. Ramirez*,
  594 U.S. 413 (2021) ..........................................................................................7, 8, 9, 10

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
  No. 23-cv-2776 (CKK), 2025 WL 27162 (D.D.C. Jan. 3, 2025)....................................12

*Tripp v. DOD*,
  193 F. Supp. 2d 229 (D.D.C. 2002) ..............................................................................20

*United States v. Nixon*,
  418 U.S. 683 (1974) .........................................................................................................6

*U.S. Army Corps of Eng'rs v. Hawkes Co, Inc.*,
  578 U.S. 590 (2016) .................................................................................................15, 16

*Venetian Casino Resort, LLC v. EEOC*,
  530 F.3d 925 (D.C. Cir. 2008).....................................................................................17

*Westcott v. McHugh*,
  39 F. Supp. 3d 21 (D.D.C. 2014).................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..............................................................................................4, 13, 30

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)................................................................................12, 13

## Executive Orders

Executive Order 14,158 ..............................................................................................1, 2, 5, 27

## Federal Constitution and Statutes

U.S. Const, art. II .................................................................................................................5

5 U.S.C. § 552a .........................................................................................................*passim*

5 U.S.C. § 702 ......................................................................................................................22

5 U.S.C. § 704 ..........................................................................................................14, 15, 18

5 U.S.C. § 706 ......................................................................................................................28

5 U.S.C. § 2105 ..........................................................................................................23, 24, 26

5 U.S.C. § 3161 ......................................................................................................................2

26 U.S.C. § 6103 ............................................................................................ 11, 21, 23, 28

26 U.S.C. § 7431 ............................................................................................ 12, 13, 21, 30


**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 65 ........................................................................................................31


**Other Sources**

*Employee*, Black's Law Dictionary (12th ed. 2024) .........................................................24

GAO 2024 Annual Report ................................................................................................5

GAO Report, *Department of Education: Preliminary Results* (Sept. 24, 2024) ..................2

Restatement 2d of Torts § 652D ......................................................................................9

Transcript of Feb. 7, 2025 Press Conf. ..........................................................................27

Tyler Kingkade & Natasha Korecki, *Inside DOGE's takeover* (Feb. 8, 2025) ..................11


**Regulations**

34 C.F.R. § 5b.3 ............................................................................................................28

34 C.F.R. § 5b.9 ....................................................................................................... 26, 28

34 C.F.R. Pt. 5b, App'x ................................................................................................26

## INTRODUCTION

Plaintiff brings this unsupported challenge to the President's ability to exercise politically accountable oversight of agency activities and to implement his policy priorities. Dissatisfied with those priorities, Plaintiff seeks a temporary restraining order barring employees of the U.S. Department of Education, whose responsibilities include liaising with the United States DOGE Service ("USDS"), from accessing Department of Education systems necessary to perform their Presidentially-directed mandate of reducing waste, fraud, and abuse in student loan programs. As demonstrated below, Plaintiff is not entitled to the injunction it seeks, which would raise separation-of-powers concerns by impermissibly intruding into the President's superintendence of the Department of Education. Further, Plaintiff cannot establish neither standing nor irreparable harm. Nor is Plaintiff likely to succeed on the merits of its claims. The Administrative Procedure Act ("APA") does not provide a cause of action for its claims. Even if it did, there is no violation of the Privacy Act when employees of an agency, like the six individuals at issue here, access agency systems to perform their job duties. As for § 6103 of the Internal Revenue Code, the Department of Education DOGE Team has not accessed federal tax information governed by that statute. Any future access to such information will satisfy the relevant statutory criteria. Finally, the balance of harms favors Defendants and the public interest in implementing the mandate for which the President was elected. For these reasons, Plaintiff's motion for a temporary restraining order should be denied.

## BACKGROUND

### I.    The United States DOGE Service

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established United States Digital Service in order to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology ("IT") systems." 90 Fed. Reg. 8,441, § 4 ("USDS E.O.").

The USDS E.O. also redesignated the United States Digital Service as the Department of Governmental Efficiency Service, or U.S. DOGE Service. *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within the Executive Office of the President pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. USDS E.O. § 3(b). Agency heads are required under the USDS E.O. to establish within their respective agencies a DOGE Team of at least four employees, which may include Special Government Employees. *Id.* § 3(c).

The USDS E.O. directs USDS to collaborate with Executive agencies to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity as well as ensure data integrity. *Id.* § 4. As in other federal agencies, the need for technical reform in the U.S. Department of Education is pronounced. In a September 2024 report, for example, the Government Accountability Office identified numerous errors plaguing the agency's system for applying for federal student aid, with resulting errors in estimations of students' aid eligibility. *See* GAO Report, *Department of Education: Preliminary Results Show Strong Leadership Needed to Address Serious Student Aid System Weaknesses* (Sept. 24, 2024), *available at* https://www.gao.gov/assets/gao-24-107783.pdf.

To accomplish its objectives, the USDS E.O. directs USDS to work with relevant agency heads, and vice versa, to ensure USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the USDS E.O. instructs, USDS must "adhere to rigorous data protection standards." *Id.*

## II.     The DOGE Team at the Department of Education

Six individuals at the Department of Education, all federal employees, are assisting with implementing the President's directives from Executive Order 14,158 as part of the Department's DOGE Team. Declaration of Adam Ramada ¶¶ 3-7 ("Ramada Decl."). Two of those individuals have been hired by the Department directly. *Id.* ¶ 6. The other four are on detail, subject to written,

signed agreements, from other federal government agencies. *Id.* ¶¶ 4-5, 15. All six employees have attended an ethics briefing and received security training, and are complying with relevant rules governing employee access to personal information to the best of their knowledge. *Id.* ¶¶ 7-8. As either detailed or permanent Department of Education employees, these six individuals report to the senior leadership of the Department. *Id.* ¶ 13.

In particular, the six Department employees are responsible for "auditing contract, grant, and related programs," including "student loan programs," "for waste, fraud, and abuse." *Id.* ¶¶ 4, 9. To carry out their duties, they require "access to Department of Education information technology and data systems related to student loan programs." *Id.* ¶ 9. And they have accessed those systems to, among other functions, audit the federal student loan portfolio. *Id.* ¶ 4. The DOGE Team at the Department of Education has not accessed federal tax information governed by § 6103 of the Internal Revenue Code. *Id.* ¶¶ 10-11.

## III.    This Litigation

Plaintiff, a California nonprofit association representing undergraduate students at University of California campuses, filed its complaint on February 7. *See* Compl., ECF No. 1; *id.* ¶ 15. The complaint names Denise Carter, Acting Secretary of Education, and the Department Ms. Carter leads, as defendants. *Id.* ¶¶ 16-17. Invoking the APA, *id.* ¶¶ 58, 65, 68, Plaintiff seeks a declaration "that Defendants acted unlawfully by giving DOGE-affiliated individuals—or other individuals not authorized by law to view [Department of Education] records that contain personal information— access to those records." *Id.* at 18 ("Prayer for Relief: A."). Underlying the allegation of unlawful access is the theory that the Privacy Act and Internal Revenue Code bar recent hires at the Department from accessing systems containing information subject to the protections of those laws. *Id.* ¶¶ 59-60. Plaintiff also alleges that Defendants acted arbitrarily and capriciously in granting those hires access to Department systems. *Id.* ¶ 67. Plaintiff supplements its requested declaration with a request for

3

injunctive relief to prevent Defendants from providing "DOGE-affiliated individuals" with further access to information covered by the two statutes cited, and to prevent further dissemination or use of information already obtained. *Id.* at 18 ("Prayer for Relief: B-E.").

On February 10, three days after it filed its complaint, Plaintiff moved the Court for a temporary restraining order "enjoining Defendants . . . from disclosing information about individuals to individuals affiliated with the so-called Department of Government Efficiency (DOGE), and enjoining Defendants to retrieve and safeguard any information that has already been obtained by and shared or transferred by DOGE or individuals associated with it." Mot. at 1, ECF No. 9.

## STANDARD OF REVIEW

A temporary restraining order, like a preliminary injunction, is extraordinary relief granted only to preserve the status quo. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 1:25-cv-239, 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025). It is "an extraordinary and drastic remedy" and "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To establish entitlement, a movant must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors merge when the government is the opposing party. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020); *accord Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 20 (D.D.C. 2018). "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'" *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

## ARGUMENT

### I.    Plaintiff's Suit Improperly Attacks the President's Article II Powers

By Executive Order on January 20, the President set in motion a "government-wide" initiative "to improve the quality and efficiency of . . . software, network infrastructure, and information technology (IT) systems."  E.O. 14,158 § 4(a).  The need for this urgent intervention is well documented.  The Government Accountability Office's 2024 Annual Report identified the opportunity for the federal government to achieve billions of dollars in savings from implementing various efficiency and effectiveness measures.  Gov't Accountability Off., 2024 Annual Report, GAO-24-106915, https://www.gao.gov/assets/gao-24-106915.pdf.  To meet that need, the Executive Order calls for federal employees in each federal agency to collaborate with the United States DOGE Service, an entity within the Executive Office of the President.  E.O. 14,158 § 4(b), (c).  As relevant here, six federal employees have played a principal role at the U.S. Department of Education in implementing the DOGE E.O. at that agency.  Understood in the proper light, the implementation of the DOGE E.O. is entirely unremarkable:  the President, as head of the Executive Branch, has identified a policy priority and has directed federal employees to implement it.  *See Seila Law, LLC v. CFPB*, 591 U.S. 197, 203-04 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'  Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3).

Plaintiff has conjured a very different, more sinister, image of events.  The thrust of their narrative is that "individuals associated with the so-called 'Department of Government Efficiency'" are "third parties" to the agencies in which they serve.  Pl.'s Mot. for a Temporary Restraining Order at 2, ECF No. 9.  This characterization of "third parties," however, rests entirely on distinctions that do not exist in the relevant statutes.  As described in greater detail *infra*, both the Privacy Act and the

relevant provision of the Internal Revenue Code utilize the term "employee" in establishing the parameters of access to certain personal information. And the relevant employees are straightforwardly federal government employees, of the Department of Education in particular.

The following Parts explain why Plaintiff's claims fail for both threshold (jurisdictional, APA) and merits reasons. Because this suit does not belong in federal court at all, there is no occasion for the Court to address the constitutional principles at which Plaintiff, seeking to impose its preferred policies through litigation, takes direct aim. It is nevertheless appropriate to highlight that those principles are, ultimately, implicated by the relief Plaintiff seeks. In particular, the United States Constitution requires that the federal bureaucracy be supervised and directed by political leadership that is ultimately accountable to the President. *Cf. Seila Law*, 591 U.S. at 223-24. Federal employees charged with carrying out executive functions may be called upon by the President to gather information, and to share that information with the President. *See United States v. Nixon*, 418 U.S. 683 (1974) ("The President's need for complete candor and objectivity from advisors calls for great deference from the courts."). An order restraining them from doing so would thus be an extraordinary interference with the President's ultimate constitutional obligation to oversee the Executive Branch.

If the statutes in question required such interference, they could raise serious constitutional questions. *Cf. Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) (interpreting the Federal Advisory Committee Act to avoid separation of powers concerns). Because they do not require that result, *see infra*, the Court may leave these weighty questions for another day.

## II.    Plaintiff Has Not Shown a Substantial Likelihood of Standing

Plaintiff correctly acknowledges that it must show a "substantial likelihood of standing" to be entitled to emergency injunctive relief. *See, e.g.*, *Elec. Privacy Inf. Ctr. v. Pres. Advisory Comm'n on Election Integrity,* 878 F.3d 371, 377 (D.C. Cir. 2017) (citations omitted); *see* Mot. at 18. Plaintiff relies exclusively on an associational standing theory, Mot. at 19, which requires it to show that "(1) at least one of [its]

6

members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Elec. Privacy Inf. Ctr. v. U.S. Dep't of Comm.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (citations omitted). Plaintiff has not established these requirements.

### a. The Association's individual members have not shown standing.

To establish associational standing, Plaintiff must first show that its individual members have suffered injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "certainly impending," "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And it must be "concrete—that is, real, and not abstract." *TransUnion v. Ramirez*, 594 U.S. 413, 424 (2021) (citations omitted).

Plaintiff's theory of injury-in-fact to its members is based on the premise that those members provided the Department of Education "detailed personal information" and that Defendants' actions (1) violated their "reasonable expectation that their sensitive personal information will be securely held in accordance with governing law and basic cybersecurity principles," and (2) "puts them at an increased risk of interference, fraud, and unauthorized access." Mot. at 20. Neither suffices.

Plaintiff's reasonable expectation theory is neither legally cognizable nor supported by precedent. Defendants acknowledge that "[v]arious intangible harms can . . . be concrete." *TransUnion*, 594 U.S. at 425. But cognizable injuries are limited to those "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," *id.*, including when the plaintiff alleges harm related to the handling of her personal information, *see id.* (surveying common-law privacy torts and looking to "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury"). Plaintiff cites no case espousing the notion that the

alleged violation of a plaintiff's reasonable expectations, standing alone, suffices for Article III standing. The absence of any on-point authority is unsurprising. Were it enough for a plaintiff to establish standing simply by alleging that the holder of her personal information used it in a manner contrary to her expectations, the requirement to find a traditionally cognizable harm (including with reference to common-law analogues) would be obliterated. *See generally TransUnion*, 594 U.S. 413.

Indeed, framed another way, Plaintiff's members' "reasonable expectation" theory is simply a restated theory that defendants have violated the law. The Supreme Court's decision in *TransUnion*, however, leaves no doubt that a statutory violation is not, by itself, a cognizable Article III injury. *Id.* at 426-27. Rather, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in federal court. *Id.* at 427 (emphasis in original). Notably, Plaintiff's members do not allege—much less establish—tangible harm. There is thus no cognizable injury from the Education employees' alleged access, and *Council on American-Islamic Relations v. Gaubatzi*, 667 F. Supp. 2d 67 (D.D.C. 2009), on which Plaintiff relies, is easily distinguishable on that basis. *Id.* at 76 ("CAIR has provided evidence that Defendants have caused [their] material to be used and publicly disclosed.").

Plaintiff's attempt to repackage a purported violation of "reasonable expectations" as emotional distress is also unavailing. *See* Mot. at 21. To start, Plaintiff's declarations merely allege, in conclusory fashion, that "significant emotional distress" comes from the increased risk of *future* instances of identity theft and other purported misuses of their data, not from alleged past activities. *See, e.g.*, Caceres Decl. ¶ 7. For the reasons discussed below, those purported injuries are not cognizable. Even if Plaintiff were alleging emotional distress from a violation of their reasonable expectations, however, that would not suffice. Although the standing inquiry is often independent of the merits of a plaintiff's claim, *Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024), assessing whether a particular alleged injury is cognizable necessarily means asking whether that injury is of a

8

type remediable by a court in a suit for the claim at issue. One of the cases Plaintiff cites recognizes as much. *Thompson v. Trump*, 590 F. Supp. 3d 46, 71 (D.D.C. 2022) (distinguishing between sufficiency of emotional harm as a standing predicate for common-law claims and for statutory claims); Mot. at 21-22. And here, Plaintiff proffers no authority (nor are Defendants aware of one) holding that emotional distress from a violation of reasonable expectations about how personal information would be handled is cognizable.

Nor does Plaintiff allege that a common-law privacy tort caused the alleged emotional distress. To be sure, "disclosure of private information" may cause constitutionally cognizable harms. *TransUnion*, 594 U.S. at 425. But here, Plaintiff does not establish that its members' private information has been publicly disclosed. And that is fatal to its attempt to establish standing, because "the common law private torts of disclosure of private facts" requires "publicity." *See I.C. v. Zynga, Inc.*, 600 F. Supp. 3d. 1034, 1048 (N.D. Cal. 2022); *see also Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (no cognizable injury from disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public); *id.* at 1246 (citing cases); *Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 231-32 (M.D. Pa. 2023); Rest. 2d of Torts § 652D ("Publicity given to private life"); *see also TransUnion*, 594 U.S. at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation." (citations omitted)).

Notably, this is not a data breach case, where a breach by an outside intruder (and thus public disclosure) has already occurred. *See In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 55 (D.C. Cir. 2019) (per curiam). Rather, even taking Plaintiff's allegations as true, there has merely been, at most, intra-governmental information exchange. *Barclift v. Keystone Cred. Servs., LLC*, 585 F. Supp. 3d 748, 758-59 (E.D. Pa. 2022) ("Even assuming that the employees of the mailing vendor read Barclift's personal information, sharing her personal information with 'a small group of persons is not publicity.'"

(citation omitted)), *aff'd*, 93 F.4th 136, 146 (3d Cir. 2024) ("Like our sister circuits, we conclude that the harm from disclosures that remain functionally internal are not closely related to those stemming from public ones."). Indeed, Plaintiff's members' declarations make clear that their true complaint is that Defendants have not complied with their view of the law. *See, e.g.*, Caceres Decl. ¶ 6 ("I have not consented to having my personal and financial data used for any purpose other than the purposes previously disclosed by ED in its System of Records Notices"); Doe Decl. ¶ 6 (same); Hariharan Decl. ¶ 9 (same). "But under Article III, an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427.

Plaintiff next alleges a hypothetical future risk of "identity theft." Mot. at 22. But this claim is too speculative and attenuated to support standing. Plaintiff does not appear to argue that the DOGE individuals themselves will "hack" the information, but that their actions will make the underlying information more vulnerable to third-party hackers. This supposition is speculative and not a basis for standing. Notably, for Plaintiff's theory to be correct, they would have to demonstrate: (1) that access by the DOGE individuals will—by some unknown mechanism—materially increase the risk of hacking, notwithstanding ED's existing internal controls; (2) that there will be a cybersecurity incident that will compromise ED's information; and (3) that the plaintiff members' information specifically will be compromised; and (4) that compromise will cause the Plaintiff's members cognizable harm. This "chain of causation is simply too attenuated." *Alliance*, 602 U.S. at 392; *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("The one-step-removed, anticipatory nature of [plaintiffs'] alleged injuries" fails to satisfy standing), *remanded*, 114 F.4th 406 (5th Cir. 2024). "[F]ears of hypothetical future harm that is not certainly impending," without more, cannot satisfy Article III. *Clapper*, 568 U.S. at 416. Again, this case is far removed from the OPM data breach litigation where the information had already been breached by nefarious third-party actors. *See In re OPM Data Sec. Breach Litig.*, 928 F.3d at 55.

Plaintiff simply asserts that access to this information by a limited number of people will likely result in the information being compromised by third-party bad actors. Indeed, Plaintiff's rationale for the likelihood of future injury is that data will be purportedly uploaded to "artificial intelligence systems hosted on non-government servers," without an explanation for how that creates a "substantial" risk of future injury; an allegation that Defendants are failing "to comply with security protocols," without explaining what specific protocols they are allegedly ignoring, and an *ad hominem* assertion that a "DOGE-affiliated individual who reportedly has access to ED systems was associated with a data breach in the past," without explaining his role, or how that might translate here. Mot. at 22. This is too speculative to justify standing.

Plaintiff finally speculates that the information involved may be used for future immigration-enforcement purposes. Mot. at 22-23. But the sole basis for this speculation is Plaintiff's assertion that "[i]ndividuals within ED have expressed concern that this will occur," citing an online story that never mentions immigration at all. *See* Mot. at 22 (citing Tyler Kingkade & Natasha Korecki, *Inside DOGE's takeover of the Education Department*, NBC News[1] (Feb. 8, 2025)). Online articles that do not stand for their quoted propositions are not a basis for Article III standing.

### b. Participation of individual members is required.[2]

Plaintiff also lacks standing because the participation of individual members is necessary. Plaintiff's APA claim is—inappropriately—premised on violations of the Privacy Act and tax return privacy statutes. *See* 5 U.S.C. § 552a; 26 U.S.C. § 6103. But these statutes—which do *not* provide for injunctive relief—require specific disclosures with respect to specific persons; in other words, the violations themselves are individualized. *See, e.g.*, 26 U.S.C. § 7431(a) (providing for a "civil action for damages" in the event of improper inspection or disclosure of a tax return or return information "with

---

[1] https://www.nbcnews.com/news/us-news/elon-musk-doge-team-education-department-rcna191244.

[2] For purposes of this motion only, Defendants do not contest germaneness.

respect to a taxpayer"); 5 U.S.C. § 552a(g)(4) (providing for a damages suit with recovery based on the "actual damages sustained by the individual").  Because these statutes require "individualized determinations" to establish violations, the participation of individual members is required—and Plaintiff lacks associational standing.  *See, e.g.*, *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776 (CKK), 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025) (rejecting associational standing claim when "individualized determinations" were required).  Indeed, precisely because organizations and associations cannot statutorily bring Privacy Act or Section 6103 claims—because those claims are specific and personal to individual persons—they should not be permitted to side-step those requirements here.

### III.    A Temporary Restraining Order Is Unwarranted

As described above, Plaintiff lacks standing to bring this suit.  Even if the Court concluded otherwise, however, it should not enter a temporary restraining order.  As Plaintiff has not shown standing, it has *a fortiori* not shown certainly impending irreparable injury, as it must to obtain the extraordinary remedy of emergency injunctive relief.  Nor is Plaintiff likely to succeed on the merits: it lacks a cause of action under the APA (which it invokes to support its claims); it has not shown a likely violation of any statute or a likelihood of arbitrary and capricious action.  Finally, the balance of the equities favors Defendants.

#### a.    Plaintiff has not shown irreparable injury.

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).  "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Plaintiff's motion should be denied because it has not demonstrated the "certain and great"

injury that this Circuit requires to demonstrate irreparable injury. *See Wis. Gas*, 758 F.2d at 674; *see also Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (applying *Wisconsin Gas* requirement that irreparable injury must be "certain and great").

To start, Plaintiff cannot establish that any injury—to its members, in any event, it claims no injury to itself—is "certain." Plaintiff's claims of irreparable injury rest largely on the risk of *future* injury, in the form of potential data breaches or the use of information for immigration related purposes. *See* Mot. at 29-30. This purported injury fails for the same reason Plaintiff's members do not have standing: it is speculative, and thus cannot be the basis for emergency injunctive relief. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

Nor can Plaintiff establish that legal remedies are inadequate. As it acknowledges, Mot. at 31-32, both the Privacy Act and section 6103 provide for money damages and a private right of action by an affected person, subject to the requirements of those statutes, in the event of a disclosure in violation of the law. *See* 5 U.S.C. 552a(g)(4)(authorizing civil penalties for violation of the Privacy Act); 26 U.S.C. § 7431(a) (authorizing civil penalties for violation of section 6103). It is possible, to be sure, that Plaintiff's members may not be able to succeed on such a claim—perhaps because they do not satisfy the requirements of those statutes—but that is a feature, not a bug, of Congress's decision to limit relief to certain circumstances. And, in any event, it is speculative whether such remedies would be unavailable, just as they speculate as to whether such remedies would even be necessary. Plaintiff cannot circumvent Congress's limitations on relief by claiming irreparable injury.

### b.  Plaintiff is not likely to succeed on the merits.

As has been established, the Court need not consider the merits of Plaintiff's claims, or its likelihood of success thereon, at all. *See Aamer v. Obama*, 953 F. Supp. 2d 213, 223 (D.D.C. 2013)

(denying a motion for preliminary injunction for lack of jurisdiction); *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 53-54 (D.D.C. 2017) (denying a motion for injunctive relief because irreparable harm absent). If the Court does reach the merits, however, it should decline to grant the relief requested. Plaintiff's entire theory rests on the erroneous notion that the Department of Education DOGE Team's members are not employees of the Department of Education. They are. What is more, they need access to large datasets (including material that may be covered by the Privacy Act) to carry out their (again, Presidentially-directed) functions. They have not, in contrast, accessed any federal tax information protected by § 6103. Plaintiff has thus not established any chance of success, let alone a likelihood, on its theory that Defendants are acting in excess of their authority. Nor has Plaintiff established that Defendants have acted arbitrarily or capriciously. For these merits reasons, a temporary restraining order is not warranted.

### i. Plaintiff cannot obtain relief under the APA.

Plaintiff brings all three of the counts in its complaint under the APA. Compl. ¶¶ 58, 65, 68. But the APA does not permit "judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (quotation omitted). Rather, the cause of action that statute provides, 5 U.S.C. § 704, is limited in two ways material here. Agency action must be "final" to be reviewable. *Id.* And if there is an adequate alternative remedy, including a distinct statutory cause of action, the plaintiff must sue under the alternative instead. *See id.* Plaintiff's claims satisfy neither condition. It thus lacks a cause of action under the APA, requiring denial of its motion. *See Genesis Cap., LLC v. Lauravin Luxury Apts. Homes, LLC*, Civil Action No. 23-795 (JEB), 2023 WL 3452305, at *2 (D.D.C. May 15, 2023) (denying a motion for preliminary injunction because plaintiff had no cause of action).

### 1.  Plaintiff has not identified final agency action.

APA review is limited to "final agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004) (quoting 5 U.S.C. § 704) ("*SUWA*").  Neither the Complaint nor the Motion directly states what action Plaintiff considers to be final within the meaning of the statute, but the theory appears to be that the relevant action is the agency's provision of access to its technical systems and databases.  *See* Compl. ¶¶ 11 (describing "Defendants' action granting DOGE-affiliated individuals continuous and ongoing access to that information"), 53 ("At least some of these DOGE staffers have reported 'gained access to multiple sensitive internal systems'"); Mot. at 24 ("Defendants' action giving DOGE access to ED's records is contrary to law and in excess of their statutory authority").

Assuming that is true, Plaintiff has not established that giving a new employee access to his or her computer is "final agency action" reviewable under the APA. Agency action is final only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

As a matter of common sense, it is difficult to understand how providing a new employee with computer access necessary to his functions "consummat[es]" the hiring agency's decisionmaking process in any formal sense. *Hawkes Co.*, 578 U.S. at 597.  And "informal" agency actions, as a general matter, have not been considered "final" under *Bennett*'s first prong. *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (*Abbott Laby's v. Gardner*, 387 U.S. 136, 151 (1967)).  Nor is it apparent (and Plaintiff does not explain) how an employee being able to access a system and the data therein has "direct and appreciable legal consequences" for anyone at all. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019).  To establish finality, Plaintiff would need to show (at the very least) that its members' data has, in fact, been improperly disclosed (including to the Department of

Education DOGE Team)—not just that the Team had access to it.  By analogy, an agency's decision to give an employee a work computer is not itself final agency action, even if the employee might conceivably use the computer to effect final agency action (*e.g.*, in approving or denying benefits). Because finality is analyzed from a "pragmatic" point of view, these facial oddities seriously undermine Plaintiff's claim that it exists here.  *See Hawkes Co.*, 578 U.S. at 599.

The Court need not rely on pragmatism alone, however, because precedent confirms what common sense suggests:  that "broad programmatic attack[s]" like Plaintiff's fall categorically outside the ambit of judicial review under § 704.  *See SUWA*, 542 U.S. at 64.  In *Lujan v. National Wildlife Federation*, the plaintiffs challenged an agency's "land withdrawal review program" in its entirety.  497 U.S. 871, 890 (1990).  That challenge could not proceed, the Supreme Court held, because the "program" did "not refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations."  *Id.*  Instead, the "program" was "simply the name by which [the plaintiffs] have occasionally referred to the continuing (and thus constantly changing) operations of the [agency] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by" federal law.  *Id.*

Plaintiff's challenge to the Education employees' "access" is deficient in similar ways.  Despite how it is framed, an "action giving" certain employees "access to ED's records," Mot. at 24, is not in fact a single, discrete event with legal consequences for Plaintiff's members.  It is rather the name by which Plaintiff refers to the Department's "continuing (and thus constantly changing) operations," which include taking various steps to modernize and strengthen protections for its data systems.  *See Nat'l Wildlife Federation*, 497 U.S. at 890.

Limiting judicial review to final agency action in circumstances like those at issue in *National Wildlife Federation*—and at issue here—preserves "the APA's conception of the separation of powers." *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019).  As *National Wildlife Federation* recognizes,

one facet of that conception arises out of respect for the democratic process. 497 U.S. at 891 (A plaintiff may not "seek *wholesale* improvement of [an agency's] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." (emphasis added)). But another, equally important facet recognizes the limits of judicial resources. *See City of New York*, 913 F.3d at 431 ("[Courts] are woefully ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction, or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." (internal citation omitted)). Those concerns are directly relevant to this case, where Plaintiff seeks "a general review" of the Department's "day-to-day operations." *See Nat'l Wildlife Federation*, 497 F.3d at 899.

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), does not compel a contrary conclusion. *See* Mot. at 24 (citing *Venetian Casino Resort*). There, the EEOC was held to have a concrete policy (albeit informal) of disclosing confidential information, including trade secrets, without providing notice to the submitter. *Id.* at 929-30. In other words, *Venetian Casino* involved an explicit agency policy of disclosing third-party information under specific circumstances. But here, Plaintiff does not evidence facts showing the existence of a new policy—rather, its claim is simply that ED inappropriately gave access to certain records to certain personnel. This is, if anything, the routine *application* of an existing policy, which is not reviewable final agency action. *See SUWA*, 542 U.S. at at 61-62 (programmatic challenges are not permissible). Moreover, if Plaintiff claims that Defendants misapplied their Privacy Act or IRC policies to its members in a way that caused those members cognizable harm, those members could potentially bring a standalone Privacy Act or IRC claim under those statutes rights of action. Plaintiff cannot claim that every time a policy is followed that it is final agency action—just like it would not be final agency action every time an employee is given access to

their email accounts, even though there may be an underlying email access policy that could itself be final agency action.

## 2.  Plaintiff has an adequate alternative remedy.

Plaintiff's APA claims fail for the additional, independent reason that the APA does not grant a cause of action where there is "[an]other adequate remedy in any court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, a plaintiff has adequate relief—and thus cannot avail herself of § 704—"'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). Stated differently, where an agency action is subject to review in some manner under a statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review established by the statutory review scheme is presumed exclusive. This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Under these principles, Plaintiff is not entitled to challenge purported violations of the Privacy Act and the Internal Revenue Code under the APA, because each statute provides an adequate alternative remedy for persons entitled to sue under those statutes.

### a.  Privacy Act of 1974

The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). The Privacy Act applies only to individuals, not corporate or organizational entities. 5 U.S.C. §552a(g)(1)(D) (authorizing a cause of action for adversely affected "individuals"); *id.*, §552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). Although Plaintiff purports to sue on behalf of its members' interests, the fact that it could not bring its own Privacy Act claim underscores that it should not be permitted to circumvent statutory limits through the APA.

Relief under the Privacy Act is carefully circumscribed. Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), 5 U.S.C. § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse act on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D). For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the

refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful" and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299.

Beyond these monetary damages, the Act allows for injunctive relief in only two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). Injunctive relief, as the D.C. Circuit has recognized, is not available for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs . . . .") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)); *see also Cell. Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Given the Privacy Act's comprehensive remedial scheme, courts have repeatedly recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002); *Poss v. Kern*, No. 23-cv-2199, 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (citing cases). That is consistent with the principle that "[w]here [a] 'statute provides certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell. Assocs.*, 579 F.2d at 1161-62). This is especially true with the Privacy Act because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell. Assocs.*, 579 F.2d at 1158-59.

Indeed, as the Ninth Circuit concluded, were injunctive relief available for violations of the Privacy Act generally, "the detailed remedial scheme adopted by Congress would make little sense. We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for

two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.* at 1160. Plaintiff's efforts to obtain an agency-wide injunction on both information sharing and personnel actions by channeling Privacy Act claims through the APA would be an end-run around these common-sense principles and should be rejected.

### b. Internal Revenue Code

For similar reasons, it would be inappropriate to allow Plaintiff to use the APA to circumvent the remedial scheme provided in the Internal Revenue Code for violations of 26 U.S.C. § 6103. Congress created a waiver of sovereign immunity for violations of § 6103 by authorizing only civil damages against the United States, at 26 U.S.C. § 7431. Specifically, § 7431 authorizes a right of action against the United States if "any officer or employee of the United States knowingly, or by reason of negligence, . . . discloses any return or return information . . . in violation of section 6103." 26 U.S.C. § 7431(a)(1). Damages are authorized in the sum of "the greater of" (a) $1,000 for each unauthorized disclosure of a return or return information, or (b) the actual damages sustained by the plaintiff plus punitive damages for willful disclosures or disclosures that result from gross negligence. *Id.* § 7431(c). Civil damages under § 7431 are the sole remedy that Congress provided for a violation of § 6103, and it does not authorize injunctive relief. *See generally id.*; *see also Henkell v. United States*, No. 96-cv-2228, 1998 WL 41565, at *5 (E.D. Cal. Jan. 9, 1998) (explaining that § 7431 does not authorize injunctive relief).

Given the civil damages available to individuals whose return information is disclosed in violation of § 6103—which is part of the complex statutory scheme Congress created in the Internal Revenue Code—there is another adequate remedy available, and Plaintiff is not entitled to injunctive relief through the APA. *Cf. Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 807 (D. Ariz. 1988) (concluding that § 7314 provides an adequate remedy at law that precludes equity jurisdiction).

*     *     *

Congress's creation of comprehensive remedial schemes in the Privacy Act and the Internal Revenue Code, as discussed above, forbid the relief Plaintiff seeks under the APA. The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. As the Supreme Court has stated, the purpose of this carve-out waiver is to prevent plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). "When Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Id.* Just so here. Congress has set out the exclusive remedies for violations of the Privacy Act and in the Internal Revenue Code in the respective statutes. The APA does not provide a waiver of sovereign immunity to evade those considered judgments.

### ii.  Plaintiff has not alleged a likely violation of any statute.

Even if Plaintiff did have a cause of action under the APA, and even if that cause of action could be used to raise alleged violations of the Privacy Act and Internal Revenue Code, the Court should nevertheless hold that Plaintiff is not likely to succeed on the merits of its claim that Defendants will violate those statutes. Most fundamentally, all of the relevant employees are federal employees of the Department of Education. What is more, they have need for access to information that may be covered by the Privacy Act in the course of their duties. And they have not accessed tax-related information covered by the Internal Revenue Code. These two statutes require no more.

### 1.  The individuals advancing the Department of Education's DOGE agenda are federal employees.

The Privacy Act and Internal Revenue Code impose distinct restrictions on the lawful uses and disclosure of certain personal information held by federal agencies. Those conditions are discussed below. But one prerequisite common to both statutes is that the individual to whom

covered information is disclosed be a federal employee.[3]  At the heart of Plaintiff's suit is the erroneous allegation that "DOGE-affiliated individuals" at the Department of Education are somehow outside the category of federal employees, or else outside the category of federal employees in the Department of Education.  Neither criticism withstands scrutiny.

The Privacy Act establishes a general ban on disclosure of covered personal information, but excludes "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."  5 U.S.C. § 552a(b)(1).  In similar fashion, the Internal Revenue Code generally prohibits disclosure of tax "returns and return information," as defined in that statute, except (as relevant here) for certain disclosures to "authorized persons," a category that includes "officer[s], employee[s], [and] contractor[s], of the Department of Education." 26 U.S.C. § 6103(*l*)(13)(E)(i).  For present purposes, the lawfulness of disclosure under the Privacy Act and Internal Revenue Code turns on whether the members of the Department of Education DOGE Team are employees of the Department of Education.  The answer is plainly yes.

Start with the initial question of federal employment.  Both the Privacy Act and § 6103 of the Internal Revenue Code use the term "employee."  5 U.S.C. § 552a(b)(1); 26 U.S.C. § 6103(*l*)(13)(E). "[F]or purposes of" Title 5 of the U.S. Code, "employee" "means an officer and an individual who is" first "appointed in the civil service by one of the following acting in an official capacity."  As relevant here, the ensuing list of potential appointers includes "the President" and "an individual who is an employee under this section."  *Id.* § 2105(a)(1)(A), (D).  An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act; and . . . subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position."  *Id.* § 2105(a)(2).  Because the Privacy Act is part of Title

---

[3] The Privacy Act and Internal Revenue Code also permit access to protected information by officers, a category not at issue here.  *See* 5 U.S.C. § 552a(b)(1); 26 U.S.C. § 6103(*l*)(13)(E)(i).

5, § 2105's definition of employee directly applies to its use of the term "employee." *See id.* § 552a(b)(1).

There are good reasons to read the Internal Revenue Code's use of "employee" to follow the same definition, too. For one, the ordinary meaning of the term—the touchstone of statutory interpretation, *see Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 816 (2024)—is consistent with the statutory definition at § 2105. *Compare Employee*, Black's Law Dictionary (12th ed. 2024) ("Someone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance."), *with* 5 U.S.C. § 2105(a). Were the ordinary meaning not enough, the Court should "not lightly assume that Congress silently attaches different meanings to the same term in . . . related statutes." *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019). And it should not assume as much here, as there is no indication that Congress intended a different meaning of "employee" (particularly a federal "employee") to apply as between two statutes imposing parallel restrictions on employees' disclosure of personal information. Accordingly, the definition of employee at § 2105(a) should apply to 26 U.S.C. § 6103.

The relevant employees at the Department of Education satisfy § 2105(a)'s definition of "employee." All have been appointed to their positions under federal law, including the detailees. Ramada Decl. ¶ 4-5, 7, 11. All are "engaged in the performance of a Federal function under authority of . . . an Executive act," *i.e.*, Executive Order 14,158. *Id.* ¶¶ 3-4. And all are ultimately subject to the supervision of the senior leadership of the Department of Education, *id.* ¶ 10, whether because they have been appointed as Department of Education employees under Education-specific statutes directly, *see id.* ¶ 6, or because they are detailed to the Department, *id.* ¶¶ 4-5.

The relevant employees also satisfy the requirement that they be employees "of" the Department of Education. *See* 5 U.S.C. § 552a(b)(1); 26 U.S.C. § 6103(*l*)(13)(E)(i). Two of the

employees were hired directly by the Department, clearly resolving their status.  Ramada Decl. ¶ 6.
The detailees from other components of the Executive Branch qualify, too.  In evaluating the
employment status of detailees, the D.C. Circuit has adopted a functional approach, looking to the
subject matter and purpose of the individual's work, their supervision, and their physical worksite as
illustrative (but not conclusive) factors.  *Judicial Watch v. Dep't of Energy*, 412 F.3d 125, 131-32 (D.C.
Cir. 2005).  Here, those factors clearly cut in favor of the detailees' status as Department of Education
employees.  Their responsibilities include identifying "waste, fraud, and abuse" in the *Department's*
student loan portfolio.  Ramada Decl. ¶¶ 4-6, 9.  They are subject to the supervision of senior
Department leadership.  *Id.* ¶ 13.  They perform their Department of Education-related work using
Department computers and IT assets.  *Id.* ¶ 14.  These facts lead to the inescapable conclusion that
they are, detail or no detail, employed by the Department of Education.  *See Judicial Watch*, 412 F.3d at
131-32; *Freeman v. EPA*, No. 02-0387, 2004 WL 2451409, at *4-5 (D.D.C. Oct. 25, 2004) (finding that
disclosure of plaintiffs' drug testing schedules and results by EPA OIG to an EPA-hired DOD
investigator did not violate Privacy Act because "according to the OMB 1975 Guidelines, an agency
that hires a member of another agency to serve in a temporary task force or similar, cross-designated
function can share otherwise protected information with that hired person and still satisfy exception
(b)(1)"); *cf. Ciralsky v. CIA*, 689 F. Supp. 2d 141, 155 (D.D.C. 2010) (permitting disclosure to "a group
of Agency contractors engaged specifically to conduct an official CIA investigation into allegations of
anti-Semitism at the Agency"); *Mount v. U.S. Postal Serv.*, 79 F.3d 531, 532, 533 (6th Cir. 1996)
(describing "physician under contract with [United States Postal Service]" as an employee or agent of
Postal Service under § 552a(b)(1)); *Laible v. Lanter*, 91 F.4th 438, 442 (6th Cir. 2024) (local employee
detailed to federal task force was a federal employee for purposes of the Westfall Act).

Plaintiff protests that employment at multiple agencies, such as may be permitted by detail
agreements like those at issue here, Ramada Decl. ¶ 11, results in an "illegitimate end-run around

privacy law." Mot. at 26. This assertion is merely Plaintiff's attempt to graft its preferred policy onto a statute that does not distinguish in the way Plaintiff wishes it did. Plaintiff cites no provision of the Privacy Act or Internal Revenue Code that limits the number of agencies at which an employee may serve. Under 5 U.S.C. § 2105(a), relevant questions instead include what work the individual is doing, and whose supervision she is working under. If the answers to those questions implicate multiple agencies, then they implicate multiple agencies. The fact remains, the employees at issue here Department of Education employees. This is true even if the Privacy Act generally prohibits inter-agency sharing of records. *See* Mot. at 4 (quoting 5 U.S.C. § 552a(b)). The vast majority of federal employees are not employed at multiple agencies, and so this provision remains operative even if some much smaller number is.

### 2. Plaintiff is not likely to succeed in establishing a Privacy Act violation.

Plaintiff is also not likely to succeed in establishing that Defendants violated the rights of its members under the Privacy Act,[4] even assuming an agency's compliance with the Privacy Act is reviewable under the APA, which it is not. The Privacy Act, 5 U.S.C. § 552a, applies to certain types of protectable records stored by an agency. *See id.* § 552a(a). While Defendants acknowledge that at least some of the information that Plaintiff identifies may be protectable under the Privacy Act, *see* Mot. at 25, Defendants have complied with the Privacy Act.

The Privacy Act specifically allows disclosure of records within system of records "to those officers and employees which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Here, as addressed above, the individuals who have access to

---

[4] Plaintiff refers in passing to Department of Education regulations governing compliance with the Privacy Act. Mot. at 4-5 (citing 34 C.F.R. § 5b.9; 34 C.F.R. Pt. 5b, App'x). Because, as Plaintiff concedes, the cited regulation mirrors the statutory requirements that it incorporates, *id.* at 4-5, and because Plaintiff does not plausibly allege enforceability of the Department's "Employee Standards of Conduct," Defendants do not discuss these regulations further.

the relevant information are employees of the Department of Education. *See supra*. Moreover, Executive Order 14,158 provides that these individuals have a need to know "*all* unclassified agency records, software systems, and IT systems" to perform their duties. 90 Fed. Reg. 8441, § 4. As addressed in the Ramada Declaration, the relevant personnel have a need to access Privacy Act-protected information to audit Department of Education systems. Ramada Decl. ¶ 9.

In their motion, Plaintiff has no response, other to say that the "President has conceded" that these individuals lack "need." Mot. at 27. But the President said no such thing with respect to the information at issue here. *See* Transcript of Feb. 7, 2025 Press Conf. Between Prime Minister of Japan and President of the United States[5] (not referencing Department of Education information). Nor was the President's statement specific to the issues here or need as defined under the Privacy Act.

Moreover, even if the individuals at question were not considered ED employees, their access would still be permissible under the Privacy Act. The Privacy Act allows disclosure of protectable records without the consent of the information to whom the records relate if that disclosure if permissible for certain "Routine Uses" that are defined in a published Systems of Record Notice ("SORN"). *See* 5 U.S.C. § 552a(b)(3). ED's SORNs allow for disclosure of information within their ambit "to support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse" in program funds. *See* 88 Fed. Reg. 41942, 41949 (2023) (SORN for "Common Origin and Distribution (COD) System"); 88 Fed. Reg. 42200, 42222 (2023) (SORN for "FUTURE Act System (FAS)") (2023) (same); 73 Fed. Reg. 117, (SORN for "Financial Management System (SMS)") (2008) (allowing disclosure to federal agencies responsible for "investigating . . . violations of administrative, civil, or criminal law or regulation"). Other SORNs allow disclosure "[t]o support governmental researchers and policy analysts." *See* 84 Fed. Reg. 47265, 47269 (2019) (SORN for "National Student

---

[5]    https://rollcall.com/factbase/trump/transcript/donald-trump-press-conference-shigeru-ishiba-japan-february-7-2025/

Loan Data System (NSLDS)"). The relevant individuals have a need for this information for both of these purposes. *See* Ramada Decl. ¶¶ 3-4, 9.

Finally, Plaintiff purports to proceed under the APA. For the reasons discussed above, it cannot. But even assuming it could proceed under the APA, the relevant inquiry would be whether ED acted arbitrarily and capriciously in granting the DOGE Team access to the relevant information; it would not be a *de novo* inquiry. *See* 5 U.S.C. § 706(2). Defendants' uses meet that standard, and Plaintiff has offered no facts establishing otherwise.

### 3. Plaintiff is not likely to succeed in establishing a violation of the Internal Revenue Code.

Plaintiff also cannot show that Defendants have violated or will violate the Internal Revenue Code's restrictions on disclosure of tax return information. While the unauthorized disclosure or access of tax return information is generally prohibited, Congress has established a number of statutory exemptions that authorization release of information. In particular, Congress has authorized the disclosure of return information from the Treasury to the Department of Education to carry out the Higher Education Act of 1965. *See* 26 U.S.C. § 6103(*l*)(13). Those include the release of specific types of return information to address applications and recertifications for income-contingent or income-based repayment plans for certain student loans, *id.* § 6103(*l*)(13)(A), for monitoring and reinstating higher education loans that were discharged based on total and permanent disability, *id.* § 6103(*l*)(13)(B), and for purposes of determining eligibility and amount of federal student financial aid, *id.* § 6103(*l*)(13)(C).

Congress also authorized release of that information collected above "with respect to income-contingent or income based repayment plans, awards of . . . [certain ] Federal student financial aid . . . and discharge of loans based on a total and permanent disability" for purposes of "reducing the net cost of improper payments under such plans, relating to such awards or relating to such discharges," or "conducting analyses and forecasts for estimating costs related to such plans, awards or discharges."

*id.* § 6103(*l*)(13)(D)(i)(I), (III).  To carry out these purposes, the information described above may be disclosed, but only to an "authorized" person, *i.e.*, an "officer, employee, or contractor, of the Department of Education," who is "specifically authorized and designated by the Secretary of Education" for such purposes.  *Id.* § 6103(*l*)(13)(E)(i), (ii).

Because they are employees of the Department of Education, *see supra*; Ramada Decl. ¶¶ 7, 13, and because they have a potential future need for information protected by § 6103, Ramada Decl. ¶ 11, the relevant personnel are qualified by the statute to access information protected by § 6103. Even so, they have not, to date, accessed such information.  *Id.*  If they do in the future, they will follow all applicable procedural requirements.  *Id.*

### iii. Plaintiff is not likely to establish that Defendants have acted arbitrarily and capriciously.

Finally, Plaintiff claims that Defendants acted arbitrarily and capriciously in purportedly "reversing ED's longstanding policy fully protecting individuals' personal information, and of denying access to individuals who have no need for that information." Mot. at 28.  This claim fails.

First, Plaintiff has not articulated final agency action, *e.g.*, an actual change in policy.  It neither cites to, nor articulates, any actual specific policy reversal (rather than the application of an existing policy, *see supra*).

Nor, more fundamentally, do Defendants' actions violate the cited regulations, which appears to be Plaintiff's actual argument. 34 C.F.R. § 5b.3—which is part of ED's Privacy Act Regulations— merely states that "[i]t is the policy of the Department to protect the privacy of individuals to the fullest extent possible while nonetheless permitting the change of records required to fulfill the administrative and program responsibilities of the Department."  And 34 C.F.R. § 5b.9(b), which Plaintiff also cites, specifically provides for disclosures as authorized by the Privacy Act.  In other words, the Department follows the law—including the portions of the Privacy Act and other statutes allowing disclosure under appropriate circumstances.  These regulations neither adds nor detracts

from the Privacy Act or other statutes, and in no circumstances do they provide an independent basis to challenge Defendants' activities.

### c. The balance of the equities favors Defendants.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Neither the balance of the equities nor the public interest favors Plaintiff's request for preliminary relief.

Plaintiff makes no serious effort to explain why the equities and the public interest fall in their favor—rather, its arguments on this factor collapse into the merit. It says that because the injunction is seeking to "end an unlawful practice," and the agency's action is "unlawful," its proposed injunction is proper. Mot. at 32-33. To be clear, Defendants' practice is *not* unlawful, for the reasons stated above. Regardless, the Supreme Court has made clear that considering only likelihood of success is insufficient to justify injunctive relief. *See, e.g.*, *Winter*, 555 U.S. at 376-77 ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citations and quotation marks omitted).

The proposed injunction would harm the public interest. At its core, it would harm the public interest by limiting the President's ability to effectuate the policy choices the American people elected him to pursue by limiting his advisors and other employees' ability to access information necessary to inform that policy. It would also frustrate the President's ability to identify fraud, waste, and abuse throughout the federal government. *See* Ramada Decl. ¶¶ 3-4. And it would draw false distinctions between different types of employees, unsupported in the statutory text, frustrating the flexibility that Congress itself provided in allowing multiple avenues to federal employment.

Finally, contrary to their protests, it would not leave Plaintiff's members without remedy: if the government violates its legal obligations in a way that meets the standards Congress articulated, those members can pursue monetary remedies under the Privacy Act or the Internal Revenue Code in the ordinary course. *See* 5 U.S.C. 552a(g)(4); 26 U.S.C. § 7431(a).

## IV.    The Scope of Relief Sought Is Overbroad and Inadequately Specific

Article III demands that "a plaintiff's remedy . . . be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And Federal Rule of Civil Procedure 65(d) requires that an order granting an injunction "shall be specific in terms." Fed. R. Civ. P. 65(d); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.").

Honoring these principles in this case would mean limiting any relief to the conduct that causes Plaintiff's members' alleged injuries. Plaintiff has requested that the Court enjoin disclosures of information within the Department of Education to "individuals affiliated with the so-called Department of Government Efficiency." Proposed Order at 1, ECF No. 9-4. They do not define that term. The imprecise phrase "affiliated with [DOGE]" would sweep within the scope of an order many more employees who might have contact with DOGE, but whose access to the information at issue would not violate the statutes Plaintiff has identified in the manner it has claimed a violation. If the Court grants relief, it should be tailored to the small group of individuals who were hired and

onboarded after January 19, 2025 to effectuate (in whole or in part) the goals of the President's Executive Order 14,158.

This Court should also reject Plaintiff's proposal to enjoin disclosure of information to "individuals associated with the so-called Department of Government Efficiency." This term is undefined and easily susceptible to contested meanings. Indeed, this could sweep in the entire Department of Education workforce, because all employees, including those on DOGE Teams—regardless of their employment status—serve to effectuate the Preident's policy agenda. To the extent the Court enters relief, that relief should be limited to a defined group of individuals.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for a temporary restraining order (ECF No. 9).

Dated: February 13, 2024

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director
Federal Programs Branch

*/s/ Simon Gregory Jerome*
SIMON G. JEROME
D.C. Bar. No. 1779245
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Twelfth Floor
Washington, D.C. 20005
Tel: (202) 514-2705
Email: simon.g.jerome@usdoj.gov

*Counsel for Defendants*