## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

University of California Student
Association,

      Plaintiff,

      v.

Denise Carter, in her official capacity as
Acting Secretary of Education, et al.,

      Defendants.

Civil Action No. 25-354 (RDM)

## REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A
## TEMPORARY RESTRAINING ORDER

Daniel A. Zibel
(DC Bar No. 491377)
Alexander S. Elson
(DC Bar No. 1602459)
Tyler S. Ritchie
(DC Bar No. 90018119)
National Student Legal Defense Network
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495

Adam R. Pulver
(DC Bar No. 1020475)
Nandan M. Joshi
(DC Bar No. 456750)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

Dated: February 13, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.   Plaintiff has standing to pursue this action............................................................ 2

    A.   Plaintiff's members have suffered, and will suffer, concrete harms...................... 2

        1. Defendants' disclosure of private information is itself a concrete harm. .......... 2

        2. Plaintiff's members' emotional distress is a concrete harm. ............................. 6

        3. The chilling effect on Plaintiff's members is a concrete harm. ......................... 7

        4. The non-speculative risk of further re-disclosure constitutes harm. ................. 8

    B.   Participation of Plaintiff's members is not required. ............................................... 9

II.  Plaintiff is likely to succeed on the merits. ......................................................... 10

    A.   Plaintiff challenges final agency action.. ............................................................. 10

    B.   Neither the Privacy Act nor the IRC provides an adequate alternate
        remedy.................................................................................................................. 13

    C.   Plaintiff is likely to prevail on its claim that Defendants' actions
        violate the Privacy Act. ........................................................................................ 13

        1. Defendants' focus on six individuals is incomplete. ....................................... 17

        2. The 552a(b)(1) exception does not apply. ...................................................... 18

        3. The "routine use" exception does not apply. .................................................. 22

    D.   Plaintiff is likely to show Defendants' action is contrary to the IRC. ................. 23

    E.   Plaintiff is likely to show Defendants' action was arbitrary and
        capricious. ............................................................................................................ 24

III. The equities weigh in favor of Plaintiff................................................................ 24

IV.  The scope of relief sought is appropriate. ........................................................... 25

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Abdelfattah v. DHS*, 787 F.3d 524, 534 (D.C. Cir. 2015)............................................................ 16

*Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 806–08 (D. Ariz. 1988). ............................................. 16

*Albright v. United States*,
  732 F.2d 181 (D.C. Cir. 1984) ................................................................................................. 6

*American Federation of Government Employees v. Hawley*,
  543 F. Supp. 2d 44 (D.D.C. 2008) .......................................................................................... 7

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017) ................................................................................................. 9

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................................................................ 11

*Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000). ................................................... 2-

*Bowen v. Mass.*, 487 U.S. 879 (1988)........................................................................ 13, 14, 15, 16

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.,* 972 F.3d 83 (D.C. Cir. 2020) ...... 11

*Byrd v. United States*,
  584 U.S. 395 (2018).................................................................................................................. 5

*Calhoun v. Google LLC*,
  526 F. Supp. 3d 605 (N.D. Cal. 2021) ..................................................................................... 5

*Cell Associates, Inc. v. NIH*, 579 F.2d 1155 (9th Cir. 1978) ....................................................... 15

*Center for Biological Diversity v. EPA*,
  56 F.4th 55 (D.C. Cir. 2022).................................................................................................... 2

*Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d 31, 47 n.6 (D.D.C. 2009). ................................... 20

*DOJ v. Reporters Committee for the Freedom of the Press*,
  489 U.S. 749 (1989).................................................................................................................. 5

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir.  2021) .............................. 24

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) .................................................................................................... 5

*CREW v. DOJ*, 846 F.3d 1235 (D.C. Cir. 2017) ..................................................... 13, 14

*Doe v. Chao*,
    540 U.S. 614 (2004) ........................................................................................ 6

*Electronic Privacy Information Center v. U.S. Department of Commerce*,
    928 F.3d 95  (D.C. Cir. 2019) ........................................................................ 2

*Feldman v. Star Tribune Media Co. LLC*,
    659 F. Supp. 3d 1006 (D. Minn. 2023) ..................................................... 3, 4, 5

*Gadelhak v. AT&T Services, Inc.*,
    950 F.3d 458 (7th Cir. 2020) ........................................................................ 5

*Hall v. Harleysville Ins. Co.*,
    896 F. Supp. 478 (E.D. Pa. 1995) ................................................................. 3

*Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005). ................... 18, 19

*Lugo v. DOJ*, 214 F. Supp. 3d 32, 39–40 (D.D.C. 2016). ........................................... 22

*Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990) ...................................................... 13

*McKenzie v. Allconnect, Inc.*, ,
    369 F. Supp. 3d 810 (E.D. Ky. 2019) ............................................................ 4

*Mulhern v. Gates*,
    525 F. Supp. 2d 174 (D.D.C. 2007) ............................................................... 7

*Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020) .............................. 8

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) .... 16

*New York v. Trump*,
    485 F. Supp. 3d 422 (S.D.N.Y. 2020) ............................................................ 8

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................. 12

*In re Meta Pixel Tax Filing Cases*,
    724  F. Supp. 3d 987 (N.D. Cal. 2024) ........................................................... 6

*In re Nickelodeon Consumer Privacy Litigation*,
    827 F.3d 262 (3d Cir. 2016) ......................................................................... 3

*In re OPM Data Security Breach Litigation*,
    928 F.3d 42 (D.C. Cir. 2019) ....................................................................... 9

*Patel v. Facebook, Inc.*,,.,
    932 F.3d 1264 (9th Cir. 2019) ...................................................................... 3

*Persinger v. Southwest Credit Systems, L.P.*,
    20 F.4th 1184 (7th Cir. 2021) ................................................................ 3, 5

*Pileggi v. Washington Newspaper Publishing Co.*,
    No, CV 23-345 (BAH), 2024 WL 324121 (D.D.C. Jan. 29, 2024) ....................... 3, 4

*Poss v. Kern*, No. 23-cv-2199, 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024).................... 15

*Reynolds v. Int'l Amateur Athletic Fed.*, 505 U.S. 1301. 1301 (1992) ....................... 24

*Richardson v. Bd. of Governors of the Fed. Rsrv. Sys.,* 248 F. Supp. 3d 91, 102 (D.D.C. 2017) 22

*Salazar v. National Basketball Association*,
    118 F.4th 533 (2d Cir. 2024) ................................................................ 4

*Soundboard Ass'n v. FTC*, 888 F.3d 1261 (D.C. Cir. 2018) ....................... 11

*S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016).................... 11

*Spokeo v. Robins*,
    578 U.S. 330 (2016)................................................................ 6

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)................................................................ 2, 5, 6

*Tripp v. Dep't of Def.*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002).                15

*United States v. Miami University*, 294 F.3d 797 (6th Cir. 2002)                24

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016).     11

*Venetian Casino Resort, LLC v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) ................................................................ 12

*Westcott v. McHugh*, 39 F. Supp. 3d 21 (D.D.C. 2014)                14

**STATUTES**

*Privacy Act of 1974*

    Pub. L. No. 93-579, 88 Stat. 1896 ................................................................ 6

    5 U.S.C. § 552a(g) ................................................................ 9, 14

    5 U.S.C. § 552a(b) ................................................................ 17

    5 U.S.C. § 552a(b)(1)................................................................ 18, 20

    5 U.S.C. § 552a(a)(7)................................................................ 22

5 U.S.C. § 552a(e)(4) ........................................................................................... 22

5 U.S.C. § 702 ...................................................................................................... 16

5 U.S.C. § 704 ................................................................................................ 13, 16

*Internal Revenue Code*
26 U.S.C. § 6103 .................................................................................................. 23

26 U.S.C. § 7431 (a) ............................................................................................. 10

**OTHER**

Executive Order 14158 of January 20, 2025, Establishing and Implementing the President's "Department of Government Efficiency,"
90 Fed. Reg. 8441 (Jan. 29, 2025) ................................................................... 1, 20

U.S. Constitution, Article II, Section 3 ................................................................... 1

Restatement (Second) of Torts § 652B (1977) ......................................................... 3

Wright & Miller, 13A Federal Practice and Procedure Jurisdiction § 3531.4 (3d ed. 2024) ...................................................................................................................... 5

Zach Montague, @zjmontague, X, Feb. 13, 2025,                                               9
Elon Musk, @elonmusk, X (Feb. 10, 2025, 10:52 AM)                                          17

Transcript, Press Conference: Donald Trump and Shigeru Ishiba of Japan Hold a Press Event, February 7, 2025 ............................................................................ 21

James Bickerton, *Who Is Helping Doge? List of Staff Revealed*, Newsweek (Feb. 12, 2025) ...................................................................................................................... 19

Collin Binkley & Bianca Vázquez Toness, *Musk team's access to student loan systems raises alarm over borrowers' personal information*, Associated Press (Feb. 7, 2025) ...................................................................................................................... 10

Zach Montague & Dana Goldstein, *Musk Team Announces Millions in Cuts to Education Dept. Amid Legal Pushback*, N.Y. Times (Feb. 11, 2025), https://www.nytimes.com/2025/02/11/us/politics/musk-doge-education-data.html. ............... 20

Hannah Natanson, et al., *Elon Musk's DOGE is feeding sensitive federal data into AI to target cuts*, Wash. Post (Feb. 6, 2025) ..................................................... 8, 9

Hannah Northy & Christa Marshall, *Third DOGE official crops up at Energy Department*, E&E News (Feb. 10, 2025), ............................................................... 19

Zachary Schermele, *Students sue Education Department, allege DOGE is accessing private data*, USA Today (Feb. 7, 2025) ............................................................... 10

Theodore Schleifer, *Young Aides Emerge as Enforcers in Musk's Broadside Against Government*, N.Y. Times (Feb. 7, 2025) ................................................................. 17

## INTRODUCTION

Plaintiff University of California Student Association (UCSA) submits this reply in further support of its motion for temporary restraining order. This case is not, as Defendants assert, an effort by Plaintiff "to impose its preferred policies through litigation." ECF 16 at 14. Rather, Plaintiff is seeking to enforce the policies enacted by Congress and signed into law by prior Presidents. Even if the President disagrees with those duly enacted laws, Article II of the Constitution provides no authority to disregard them. To the contrary, Article II requires the President to "take Care that the Laws be faithfully executed."  U.S. Const., Art. II § 3.

The Court need not engage, however, with Defendants' remarkable (and frightening) argument that the President is not only himself free to disregard federal privacy laws, but also that he may direct others to do so, because Defendants have not produced any evidence that the President, who is not a party here, has actually done so. Instead, the President has directed agencies to grant DOGE access to records "to the maximum extent consistent with law."[1] That order does not countenance disregard of the law.  And the law allows only those individuals who meet specific criteria to access the information at issue in this suit. DOGE-affiliated individuals, including the six addressed in Defendants' bare declaration and others who reportedly have had access to ED systems, do not meet those criteria.

As set forth below, Plaintiff's members have experienced, and will continue to experience, several concrete harms recognized at both common law and by binding precedent, as a result of Defendants' discrete, final act of granting access to record systems to, at least, six DOGE-affiliated individuals, an act which was contrary to law and is arbitrary and capricious.

---

[1] Executive Order 14158 of January 20, 2025, Establishing and Implementing the President's "Department of Government Efficiency," 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025)

# ARGUMENT

## I.    Plaintiff has standing to pursue this action.

Plaintiff has associational standing for the claims it has brought in this case: it has identified concrete harms to specific members, the interests it seeks to protect are germane to its purpose, and participation of individual members in this lawsuit is not necessary. *See Center for Biolog. Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022).

### A.    Plaintiff's members have suffered, and will suffer, concrete harms.

Plaintiff has alleged, and provided evidence of, a variety of concrete harms suffered by its members, any of which would be sufficient to show standing. Plaintiff's members are already injured, and will continue to be injured, by the disclosure of their sensitive information to DOGE-associated individuals—this is not a case where a plaintiff is alleging only that private, sensitive information *may* be accessed by unauthorized people. Rather, Plaintiff alleges that unauthorized people *have* and *are* accessing that information, and will continue to do so. Further, that harm has caused, and continues to cause emotional distress—a concrete harm recognized by the Supreme Court as creating standing in the context of the Privacy Act and has had a concrete chilling effect on Plaintiff's members. Plaintiff's members *also* have standing based on the non-speculative risks of future further disclosure.

#### 1.    Defendants' disclosure of private information is itself a concrete harm.

As the Supreme Court has held, "intangible harms" can be a concrete injury in fact where there is a "close historical or common-law analogue" that has been "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including "disclosure of private information." *Id.* at 425 (citation omitted). *See also EPIC v. U.S. Dep't of Com.*, 928 F.3d 95,

102 (D.C. Cir. 2019) (recognizing that "in the privacy context," concrete harm "ordinarily stem[s] from the disclosure of public information"). Such a disclosure of private information is the harm Plaintiff's members are alleging here.

Plaintiff need not show "an exact duplicate in American history and tradition," but one that is analogous. *See, e.g.*, *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021) (holding that "whether [plaintiff] would prevail in a lawsuit for common law invasion of privacy is irrelevant," so long as "the harm alleged in her complaint resembles the harm associated with intrusion upon seclusion"). Here, Plaintiff's harm is analogous to two harms recognized at common law: that recognized by the privacy tort of intrusion upon seclusion, and the infringement of a property owner's right to exclude.

**a**. The "intrusion upon seclusion" form of invasion of privacy "does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." Restatement (Second) of Torts § 652B (1977), cmt. a. That tort has been established in numerous cases where individuals who are authorized to view an individual's sensitive personal information have shared that information with others, who are not so authorized. *See, e.g.*, *Hall v. Harleysville Ins. Co.*, 896 F. Supp. 478, 484 (E.D. Pa. 1995) (sharing of credit reports); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1015 (D. Minn. 2023) (sharing of video-viewing history); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) (sharing of browsing and video-viewing history); *Pileggi v. Washington Newspaper Publ'g Co., LLC*, No. CV 23-345 (BAH), 2024 WL 324121, at *5 & n.2 (D.D.C. Jan. 29, 2024) (same; collecting cases); *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273 (9th Cir. 2019)

(developing and permitting others to use facial identification software); *McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810, 819 (E.D. Ky. 2019) (sharing of employee information). Notably, these cases do not require malicious intent by the disclosing party. *E.g.*, *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542–43 (2d Cir. 2024) (concluding that an allegation that an individual's "personally identifiable information was exposed to an unauthorized third party" "is sufficiently concrete," even if that third party is a "legitimate business"). And, post-*TransUnion*, courts have found factual scenarios like this one as sufficiently analogous to the common law to support an injury-in-fact. *E.g.*, *Feldman*, 659 F. Supp. 3d at 1015; *Pileggi*, 2024 WL 324121, at *5 (same; collecting cases).

The harm caused by Defendants' disclosures of Plaintiff's members' personal information—including asset and income information and tax return information—to unauthorized individuals is analogous to this harm: Plaintiff alleges that Defendants intentionally provided access to information regarding its members' private affairs with individuals it had reason to know were not authorized to view that information. Numerous cases have recognized analogous fact patterns as stating a claim for intrusion upon seclusion. That Plaintiff's members agreed to share their information with *some* Department employees for limited purposes does not mean that they were not harmed when that information was shared with other government employees for limited purposes, without their consent. Given the nature of the information at issue, a reasonable person would be highly offended by Defendants' unlawful disclosures.

In its opposition, ED discusses standing based only on the distinct tort of disclosure of private facts. *See* ECF 16 at 17. That tort, unlike the tort of intrusion upon seclusion, *does* require broad publication of personal information. But in discussing traditionally recognized harms in *TransUnion*, the Supreme Court mentioned as separate harms both "disclosure of private

information[] and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425. Each of the traditional harms that the Supreme Court discussed in *TransUnion* is sufficient on its own to establish standing. So, if a plaintiff can show a harm analogous to the harm from the tort of intrusion upon seclusion, it is "irrelevant" whether they could show a harm analogous to the harm from the tort of disclosure of private information. *Persinger*, 20 F.4th at 1192; *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (holding plaintiff had standing solely based on injuries analogous to those from intrusion upon seclusion); *cf. Feldman*, 659 F. Supp. 3d at 1015 ("[U]nder the common law tradition associated with invasion-of-privacy and intrusion-upon-seclusion claims, 'publication' of a private matter is not an essential element.").

**b.** Plaintiff's members also have standing because their injury is also analogous to the well-recognized harm suffered from the invasion of a property interest. *See* Charles Wright & Alan Miller, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed. 2024) ("Standing is found readily … when injury to some traditional form of property is asserted.").

"One of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." *Terrence Byrd v. United States*, 584 U.S. 395, 405 (2018) (quotation marks omitted). At common law, this right to exclude has been found to apply to "the individual's control of information concerning his or her person." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989); *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (collecting cases endorsing a "right to exclude" theory that "users have a property interest in their personal information"). Likewise, Congress has recognized this right to exclude by enacting statutes that ensure individuals "retain control over their personal information." *Eichenberger v. ESPN, Inc.*, 876

F.3d 979, 983 (9th Cir. 2017) (discussing the Video Privacy Protection Act). In line with that approach, the Privacy Act protects individuals' privacy interests by, among other things, "requiring federal agencies, except as otherwise provided by law, to … permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent." Pub. L. No. 93-579, § 2(b), 88 Stat. 1896, 1896 (1974). This recognition is one which "[c]ourts must afford due respect," as "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *TransUnion*, 594 U.S. at 425 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).

By disclosing Plaintiff's members personal information without authorization, Defendants deprived Plaintiff's members of their right to exclude; this deprivation is sufficiently akin to "the diminishment of a present or future property interest" to constitute a concrete harm. *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1024–25 (N.D. Cal. 2024).

### 2.  Plaintiff's members' emotional distress is a concrete harm.

Beyond the disclosure itself, the emotional distress attested to by Plaintiff's members is a concrete harm. Although Defendants insist otherwise, ECF 16 at 15–16, emotional distress as a result of a disclosure can constitute harm, even absent further disclosure. In *Doe v. Chao*, 540 U.S. 614 (2004), an individual brought a claim based on the actual disclosure of his social security number in violation of the Privacy Act. His sole asserted injury was garden variety emotional distress. The Supreme Court held that this "adverse effect" was insufficient to allow him to recover the minimum statutory award under the statute's damages provision, which only allows recovery for "actual" damages—but explicitly recognized that it *was* enough to provide him with Article III standing.  *Id.* at 624–25; *see also Albright v. United States*, 732 F.2d 181, 186 (D.C. Cir. 1984) (holding that "emotional trauma alone is sufficient to qualify as an 'adverse

6

effect' under the Privacy Act); *Mulhern v. Gates*, 525 F. Supp. 2d 174, 184  n.13 (D.D.C. 2007) (holding that allegations that a disclosure caused an individual "to experience emotional distress [are] sufficient to establish an 'adverse effect' of the sort required to confer standing.").

Plaintiff's members have adequately alleged the same—if not a greater—adverse effect than that in *Doe*. In connection with its opening memorandum, Plaintiff submitted three declarations attesting to emotional distress caused by the disclosure of their private information that has already occurred, and will continue to occur. One declarant, CSA member Jane Doe, expressed distress over the concerns that the unlawful access of her information will put her family's status in the United States at risk. *See* ECF 9-3.

Defendants appear to misunderstand the nature of the emotional distress suffered by and attested to by Plaintiff's members. That distress has been caused by DOGE's access to their information, combined with Defendants' refusal to specify the purposes for which that information is being used. To the extent that Plaintiff's member's declaration was unclear about the nature of the emotional distress, Plaintiff has submitted a further declaration of Jane Doe, clarifying with greater detail about how Defendants' actions have caused her emotional distress. *See* Supplemental Decl. of Jane Doe. Such distress "is not speculative nor dependent on any future event, such as a third party's misuse of [Plaintiff's members'] data." *Am. Fed'n of Gov't Empls. v. Hawley*, 543 F. Supp. 2d 44, 51 (D.D.C. 2008).

### 3.  The chilling effect on Plaintiff's members is a concrete harm.

In its moving papers, Plaintiff asserted that Defendants' actions have "had a concrete chilling effect, discouraging students and their families from applying for aid–or attending college at all."  ECF 9 at 33–34. Plaintiff's members have attested to such a chilling effect, explaining that they are fearful about the risks of turning over their data to ED in the future, even if it requires sacrificing the necessary financial aid to continue their education. *See, e.g.*, ECF 9-1

at ¶ 11. In the days since Plaintiff filed its motion for a temporary restraining order, this chilling effect has become even more apparent, as explained in the accompanying declarations of Sharmon Goodman and Alison De Lucca. *See* Decl. of Alison De Lucca ¶¶ 4–8; Decl. of Sharmon Goodman ¶¶ 7–8. This chilling effect is particularly pronounced for students in mixed-status families, and is likely to be magnified by Defendants' submissions purporting to justify their access to student data. ECF 9-3 at ¶ 8; Supplemental Declaration of Jane Doe ¶¶ 10–11; Declaration of Sharmon Goodman ¶¶ 9–14.

Defendants do not address these harms in their opposition. But there is ample support for the point that such a chilling effect is a concrete harm. *See, e.g.*, *New York v. Trump*, 485 F. Supp. 3d 422, 447–53 (S.D.N.Y. 2020), *vacated on other grounds*, 592 U.S. 125 (2020) (considering plaintiffs' declarations as to chilling effects to establish standing to challenge a presidential memorandum); *Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y. 2020) (considering the "chilling effect on immigrants" to support finding that an injunction was in the public interest).

### 4. The non-speculative risk of further re-disclosure constitutes harm.

In addition to the harms caused by disclosure to DOGE itself, the risk that Plaintiff's members' information will be *further* disclosed to third parties—intentionally or otherwise—creates a different kind of harm. Although Defendants' claim that it is "unknown" how Defendants' actions "materially increase the risk of hacking, notwithstanding ED's existing internal controls," ECF 16 at 18, the answer is clear. There are several reports that DOGE *intends* to upload private information, including information gained at ED, to unsecure servers.[2]

---

[2] *See, e.g.*, Hannah Natanson, et al., *Elon Musk's DOGE is feeding sensitive federal data into AI to target cuts*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/nation/2025/02/06/elon-musk-doge-ai-department-education/.

And there are several reports DOGE members—including those at ED—have violated core cybersecurity principles.[3] ED does not dispute that data might be uploaded to artificial intelligence systems on non-governmental servers that would not be subject to ED's controls. Indeed, just today, a New York Times reporter reported that, at ED, "DOGE workers have been granted a variety of unusual exceptions in recent days, including to feed data into A.I. powered systems for analysis. Those types of exceptions are causing a lot of consternation among staff who are tasked with info[rmation] security" but "every effort has been made to make security accommodations so that DOGE's work can go on, even over some internal objections."[4] That reporter further noted that "already this week," one DOGE member assigned to ED had his laptop either lost or stolen.[5]

Together, this evidence makes it likely that Defendants' actions have placed Plaintiff's members at "substantial risk of identity theft." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). The records systems at issue contain "all the information needed to steal [Plaintiff's members] identities," *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 56 (D.C. Cir. 2019), presenting an "obvious potential for fraud" if the information is obtained by outsiders, *id*. at 58.

### B. Participation of Plaintiff's members is not required.

Defendants argue that Plaintiff cannot satisfy the requirements of associational standing because "the participation of individual members is required." ECF 16 at 20. But their argument is based on the notion that individual participation would be required in actions for damages brought under causes of action under the Privacy Act, 5 U.S.C. § 552a(g)(4) and the Internal

---

[3] *See, e.g.*, *id.*

[4] Zach Montague, @zjmontague, X, Feb. 13, 2025, https://x.com/zjmontague/status/1890156719667597329?s=42.

[5] *Id.*

Revenue Code (IRC), 26 U.S.C. § 7431(a). Plaintiff is not bringing an action for damages. Meanwhile, Defendants have made no attempt to show why individual members' participation is necessary to adjudicate the claim that Plaintiff *has* brought—challenging the decision to provide at least six individuals with access to protected information in violation of the law.

## II.    Plaintiff is likely to succeed on the merits.

As to the merits, Defendants assert that Plaintiff's lawsuit rests on the erroneous notion that the Department of Education DOGE Team's members are not employees of the Department of Education. ECF 16 at 22. This assertion is wrong on several levels. For one, even Defendant's cursory evidentiary submission confirms that individuals who are not properly designated ED employees have been granted access to protected information. Moreover, while Defendants concede that six people have been granted access to covered record systems, the evidence they have submitted does *not* confirm that these six people are the *only* DOGE-affiliated individuals who have such access. Further, neither the Privacy Act nor the Internal Revenue Code allow every ED employee to access all ED records. As explained further below, Defendants have neither controverted the factual allegations underlying Plaintiff's claims, nor shown that Plaintiff is unlikely to succeed on the merits of these claims.

### A.    Plaintiff challenges final agency action.

The evidence offered by Plaintiff, and not disputed by Defendants, show that DOGE-affiliated individuals have been granted access to sensitive ED records systems.[6] And Defendants do not contest that their decision to grant DOGE personnel access to protected information stored

---

[6] *See, e.g.*, Zachary Schermele, *Students sue Education Department, allege DOGE is accessing private data*, USA Today (Feb. 7, 2025), https://www.usatoday.com/story/news/education/2025/02/07/students-sue-doge-education-department-musk/78329183007/; Collin Binkley & Bianca Vázquez Toness, *Musk team's access to student loan systems raises alarm over borrowers' personal information*, Associated Press (Feb. 7, 2025), https://apnews.com/article/education-department-trump-doge-8c5bba3883b3d924b28114a4f291bec4.

in ED's systems constitutes "agency action" subject to judicial review. Rather, they argue that such action is not "final," ECF 16 at 15–16, and thus not subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 704. Defendants are wrong.

Agency action is final when it "mark[s] the 'consummation' of the agency's decisionmaking process"—that is, it is not "of a merely tentative or interlocutory nature," and the action is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up)). These factors are applied pragmatically. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

Defendants argue that their decision to grant DOGE-affiliated individuals access to sensitive personal information does not consummate the agency's decisionmaking because it is "informal." Opp. 15. But the case on which they rely, *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1266 (D.C. Cir. 2018), is far afield, addressing the "informal" nature of non-binding advice from agency staff to agency leadership. That Defendants may not have committed their decision to writing does not deprive it of finality. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.,* 972 F.3d 83, 100 (D.C. Cir. 2020).  Here, the agency has ruled definitively" that DOGE will be given access to ED's systems, and has given that access. *S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). There is nothing more for the agency to do to consummate that decision.

Defendants also wrongly contend that their decision to grant DOGE access to ED's records does not have legal consequences until members' specific information is accessed by DOGE personnel. ECF 16 at 23–24. An agency's decision has legal consequences, however, when it "alter[s] the legal regime to which the agency action is subject." *Bennett*, 520 U.S. at

11

178. Until two weeks ago, ED would have needed to obtain written consent from each individual before it could disclose personal information to DOGE personnel—a privacy policy embodied in the Privacy Act, the IRC, and ED's own regulations. Defendants' new policy that grants DOGE-affiliated individuals access to ED's records deprives Plaintiff's members of their right to protect their privacy by declining to provide the required consent. In short, the agency's decision has legal consequences because it deprives individuals of the privacy protection afforded to them by law. *See Bennett*, 520 U.S. at 178 (holding agency action that authorizes the agency to take further action is final).

As Defendants recognize, ECF 16 at 25, the D.C. Circuit held as much in *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008). There, the court held that "[a]dopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which the submitter's rights and the agency's obligations have been determined.'" *Id.* at 931. None of Defendants' attempts to distinguish *Venetian* are persuasive. First, they argue that *Venetian* involved "an explicit agency policy of disclosing third-party information." ECF 16 at 25. But Defendants' decision not to be transparent with respect to the access it has given to DOGE does not make its decision non-final; the two-prong finality test does not require the agency to make a public announcement. Second, Defendants contend that Plaintiff's claim involves a "programmatic challenge[]" to "routine application of an existing policy." *Id.* (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004)). DOGE's access to ED's records was neither routine nor in accordance with existing policy, however; DOGE did not even exist within the government until January 20. And Plaintiff does not bring a programmatic challenge seeking "wholesale improvement" of ED's information systems, but rather challenges Defendants'

decision to take the "*discrete*" action of unlawfully granting DOGE access to those systems in violation of the privacy rights of Plaintiff's members. *Id.* at 64 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 879 (1990)). Finally, Defendants claim that Plaintiff's members could bring a "standalone Privacy Act or IRC claim under those statutes [*sic*] rights of action." ECF 16 at 25. That has nothing to do with whether Defendants have taken final agency action, but rather goes to the question of the adequacy of those remedies, and is addressed below.

**B.      Neither the Privacy Act nor the IRC provides an adequate alternate remedy.**

Defendants assert that injunctive relief is unavailable under the APA because the Privacy Act and the IRC provide "other adequate remed[ies]" for ED's disclosure of borrowers' personal and financial information. 5 U.S.C. § 704; ECF 16 at 26–30. Opp. at 18–22.  But the remedies available under those statutes are inadequate substitutes for the injunctive relief Plaintiff seeks.

To determine "whether an alternative remedy is 'adequate' and therefore preclusive of APA review, [courts] look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *CREW v. DOJ*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)). While "[a]n alternative that provides for *de novo* district-court review of the challenged agency action offers … evidence of Congress' will" to displace an APA remedy, *id.* at 1245, the potency of this evidence is fatally diminished where there is a significant "gap between the relief [the alternative] provides and the relief … [sought] under the APA," *id.* at 1246 (emphasis added). For example, the availability of "a naked money judgment against the United States" under an alternative statutory scheme is not necessarily "an adequate substitute for prospective relief" under the APA where a plaintiff seeks "entry of declaratory or injunctive relief that requires the [government] to modify future practices." *Bowen v. Mass.*, 487 U.S. 879, 905 (1988)

The primary relief that Plaintiff seeks is an injunction barring ED from giving

unauthorized individuals access to private personal and financial information, requiring ED to ensure that unlawfully accessed information is not further disseminated, and requiring ED to recover any records that have been unlawfully transferred. ECF 1 at 18. Neither the Privacy Act nor the IRC provides for any such relief. *Cf. Bowen*, 487 U.S. at 903 (noting that Congress withheld APA remedies when an adequate alternative remedy already existed so as not to "*duplicate* existing procedures for review of agency action" (emphasis added)).

The Privacy Act authorizes individuals to seek monetary relief under certain circumstances; injunctive relief under the Privacy Act is limited to directing an agency to amend the individual's records or to produce those records to the individual. 5 U.S.C. §§ 552a(g)(2)–(4). These forms of relief are inapposite here. Money damages against the government are not an adequate substitute for "the general equitable powers of a district court" to craft injunctive relief that preemptively averts the harmful effects of unlawful official conduct before they come to pass. *Bowen*, 487 U.S. at 905. And the difference between an injunction to have one's records corrected or produced on request and an injunction to prevent one's records from being unlawfully disseminated to unauthorized and unaccountable third parties is not merely "some mismatch." *CREW*, 846 F.3d at 1246. The two genres of injunction are entirely different in kind.

ED's contrary arguments are unpersuasive. Rather than explain why Privacy Act remedies resemble the remedies sought here, or why they would "deter [ED]" from granting unauthorized third-party access to confidential records "to the same extent [that] a successful APA claim" would, *Garcia*, 563 F.3d at 525, ED relies on three district court decisions that, it says, stand for the blanket proposition that "a plaintiff cannot bring an APA claim to obtain relief for a Privacy Act violation." ECF 16 at 28 (quoting *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014)). The cases upon which ED relies, however, rejected APA claims seeking "relief

… [that] *is* available under the Privacy Act," because, in that situation, the APA would provide only "duplicative relief." *Poss v. Kern*, No. 23-cv-2199, 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (emphasis added). In two of the cases cited by Defendants, a plaintiff sought the removal or amendment of their own governmental records, *see id.* (seeking "removal and deletion of [an] allegedly defamatory report" from official files); *Westcott*, 39 F. Supp. 3d at 23 (seeking "removal or revision" of a memorandum "contained in [plaintiff's] official military records")—relief that *is* available under the Privacy Act, 5 U.S.C. § 552a(g)(2)(A) (expressly providing for amendment); *Abdelfattah v. DHS*, 787 F.3d 524, 534 (D.C. Cir. 2015) (recognizing "expungement of agency records" as a Privacy Act remedy). The third case did not discuss remedy at all, holding only that the plaintiff could not "duplicate" her Privacy Act claims by bringing identical APA claims. *Tripp v. Dep't of Def.*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002).

Although ED also relies extensively on *Cell Associates, Inc. v. NIH*, 579 F.2d 1155 (9th Cir. 1978), *cited in* ECF 16 at 28–29, that case supports Plaintiff. *Cell Associates* involved a claim brought directly under the Privacy Act—not the APA—seeking to "enjoin the government from releasing" certain records. 579 F.2d at 1156. In rejecting the claim, the court held that "the Act makes no provision for [such relief] as part of the remedies that it … provide[s]." *Id.* at 1160. Critically, though, the APA *does* authorize a court to use its "general equitable powers" to enjoin unlawful agency action. *Bowen*, 487 U.S. at 905. In explaining that such relief is unavailable under the Privacy Act, *Cell Associates* simply underscores that the Act's remedial provisions supply no "adequate remedy" for unlawful disclosures of the sort that Plaintiff challenges here. 5 U.S.C. § 704.

As for the IRC, Defendants openly acknowledge that "[c]ivil damages … are the sole remedy" available under the statute for a violation of section 6103, and that the relevant remedial

provision "does not authorize injunctive relief." Opp. at 21. The lone case that ED cites for the proposition that damages under the IRC are an adequate substitute for injunctive relief under the APA is a 1988 case from the District of Arizona that did not so much as mention the APA, let alone address an APA claim. *See Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 806–08 (D. Ariz. 1988). That case also predates the Supreme Court's recognition in *Bowen* that the availability of an alternative damages remedy does *not* preclude an APA claim for injunctive relief. *See* 487 U.S. at 905.

Finally, ED offers a variation on its argument regarding the remedial schemes of the Privacy Act and the IRC. Rather than simply offering "adequate remed[ies]" that foreclose APA relief pursuant to 5 U.S.C. § 704, ED argues, they also "expressly or impliedly forbid[]" Plaintiff's desired relief and so foreclose relief under 5 U.S.C. § 702 as well. ED, however, cites no authority for the counterintuitive proposition that Congress's decision to offer a specific set of remedies in certain statutes—here, the Privacy Act and the IRC—forecloses Congress from offering an additional set of remedies in the APA. The authority that ED does cite, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), *cited in* ECF 16 at 30, is wholly inapposite. That case involved the Quiet Title Act, 28 U.S.C. § 2409a(a), which authorizes the federal government "to be named as a party" in certain lawsuits but states that the authorization "does not apply" under certain conditions. The Supreme Court observed that a party could not evade that statutory exception by bringing an APA claim against the government that would otherwise fall within the exception to the Quiet Title Act's waiver of sovereign immunity. *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 216. That observation has no application here. Unlike the Quiet Title Act, neither the Privacy Act nor the IRC contains language evincing a congressional desire to preserve the government's sovereign immunity with

respect to particular claims or under particular circumstances. Accordingly, neither statute forbids this Court from granting the relief that UCSA seeks under the APA.

### C.    Plaintiff is likely to prevail on its claim that Defendants' actions violate the Privacy Act.

Under 5 U.S.C. § 552a(b), records covered by the Privacy Act may not be disclosed without consent unless a statutory exception applies. Defendants concede that Adam Ramada and at least five other individuals have been granted access to Privacy Act-protected data, and are using that data. *See* ECF 16-1 at ¶ 4. They argue, however, that two exceptions apply: the exception for disclosures "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties," 5 U.S.C. § 552a(b)(1), and the exception for a "routine use," *id.* § 552a(b)(3). The meager representations in Ramada's declaration—which mimic those he filed in another case in his purported capacity as a Department of Labor detailee—do not establish the applicability of either exception and, indeed, raise more questions than answers.[7]

#### 1.    Defendants' focus on six individuals is incomplete.

Plaintiff has identified via credible evidence at least 16 DOGE-affiliated individuals with some access to the Education Department's record systems.[8] Elon Musk has also intimated that he has access to social security numbers as a result of DOGE's work.[9] And while Ramada's Declaration speaks to only six individuals, it does not state that these are the *only* six DOGE-

---

[7] *See AFL-CIO v. Dep't of Labor*, No. 1:25-cv-00339-JDB, ECF 16-1 (D.D.C Feb. 6, 2025) (attached as Ex. A).

[8] Theodore Schleifer, *Young Aides Emerge as Enforcers in Musk's Broadside Against Government*, N.Y. Times (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.

[9] Elon Musk, @elonmusk, X (Feb. 10, 2025, 10:52 AM), https://x.com/elonmusk/status/1888979333003281878.

affiliated individuals with access to ED's Privacy Act-covered records. Plaintiff agreed to extend the briefing schedule on its motion with the understanding Defendants' counsel needed more time to confirm facts. That Defendants cannot expressly state, nearly a week after the Complaint in this case was filed, which DOGE-affiliated individuals have access to record systems suggests either (1) there are others beyond the six employees addressed in the Ramada Declaration, or (2) Defendants do not know who has access to Privacy Act-protected information. Either scenario weighs in favor of preliminary relief.

### 2. The 552a(b)(1) exception does not apply.

On its plain text, the exception to the bar on disclosure contained in 5 U.S.C. § 552a(b)(1) allows disclosure only to (1) "officers and employees of the agency which maintains the record who," (2) "have a need for the record in the performance of their duties."

### a. Ramada and the unidentified USDS employee are not ED employees.

As to Ramada and the other unidentified "USDS employee" that Ramada asserts have been "detailed" to ED, Defendants' mischaracterize Plaintiff's argument as one that individuals like Ramada are not federal employees. *See generally* ECF 16 at 30. Even assuming, for the sake of this motion, that Ramada and the other unidentified USDS employee are federal employees, the question for purposes of the section 552a(b)(1) exception is whether they are "employees of the agency which maintains the record," *i.e.*, ED. 5 U.S.C. § 552a(b)(1). Ramada and the other "USDS employee" are likely not ED employees.

Plaintiff has explained that no statutory authority provides for the "detail" of an employee from DOGE to ED. ECF 9 at 37. Defendants do not respond to this point, or any relevant statutory authority. They simply insist that "employment" by an agency under the Privacy Act is to be assessed under a functional test, citing *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005). That case, however, supports Plaintiff.

18

*Judicial Watch* addressed whether records created by individuals who were detailed from the Department of Energy to the National Energy Policy Development Group (NEPDG)—which is not an agency for purposes of the Freedom of Information Act—were "agency" records by virtue of the individuals' status as Department of Energy employees. 412 F.3d at 131–32. Based on a number of factors, the Court concluded that the individuals at issue were not serving as Department of Energy employees, but rather as NEPDG employees (implicitly rejecting the notion of dual employment), even though they remained on the Department of Energy payroll. *Id.* at 132. These non-exclusive factors included (1) "that, during their detail, the employees worked exclusively on NEPDG matters;" (2) that they "were supervised by the Office of the Vice President," and (3) that they "did not occupy an office at the DOE." *Id.* at 131. And, vitally, the Court relied on the fact that there was no "evidence—nor indeed any claim by the plaintiffs—the DOE used the detail procedure in order to circumvent the disclosure requirements of the FOIA," while discussing the statute that allowed for the detail at issue. *Id.* at 132

These factors are not satisfied here as to Ramada and the unidentified "USDS employee." For one, Plaintiff's understanding is that Ramada and other USDS employees are on the Executive Office of the President payroll, not of any agency. Further, Ramada's sworn declaration in the *AFL-CIO v. Department of Labor* case makes clear that, during the time of his "detail," he has *not* been working exclusively on ED matters. *See* Ex. A. In addition to the Departments of Education and Labor, he has also reportedly been working at the Energy Department and the General Services Administration.[10] And while Ramada asserts, using

---

[10] *See* James Bickerton, *Who Is Helping Doge? List of Staff Revealed*, Newsweek (Feb. 12, 2025), https://www.newsweek.com/doge-list-staff-revealed-2029965; Hannah Northy & Christa Marshall, *Third DOGE official crops up at Energy Department*, E&E News (Feb. 10, 2025), https://www.eenews.net/articles/third-doge-official-crops-up-at-energy-department/.

identical language to that he used with respect to the Department of Labor, *see* Ex. A at ¶ 7, that he is "required to act in accordance with the directions and guidance of the Department's senior leaders," that does not mean that Ramada's work is controlled by those leaders. To the contrary, reporting indicates that the work of DOGE employees like Ramada is centrally coordinated by Elon Musk and other DOGE leadership.[11] Unlike in *Judicial Watch*, no statute authorizes the detail at issue, and there *is* a concern, absent in that case, that the "employee" designation is a ruse to allow for access to private documents, particularly in light of Ramada's concurrent "employment" by numerous agencies. Given these facts, it is likely that Ramada and the other unidentified USDS employee are not ED employees.

#### b.  None of the six individuals have a "need for" the subject records.

Even as to those of the six individuals who *are* ED employees,[12] section 552a(b)(1) allows disclosure only if they "have a need for the record in the performance of their duties." ED's vague declaration does not establish such a need.

Whether section 552a(b)(1) applies depends on "whether the official examined the record in connection with the performance of duties assigned to him and whether he had to do so in order to perform those duties properly." *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000). Courts assess "the existence of a need to know objectively, based on the facts alleged." *Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d 31, 47 n.6 (D.D.C. 2009).

Ramada's vague subjective assertion that the six employees need "access to Department

---

[11] *See, e.g.*, Schleifer, note  , *supra*; Zach Montague & Dana Goldstein, *Musk Team Announces Millions in Cuts to Education Dept. Amid Legal Pushback*, N.Y. Times (Feb. 11, 2025), https://www.nytimes.com/2025/02/11/us/politics/musk-doge-education-data.html.

[12] Defendants have provided insufficient information as to the "[t]wo additional federal government employees from other agencies are detailed to the Department of Education," ECF 16-1 ¶ 5, to determine whether they qualify as ED employees under the Privacy Act. Plaintiff thus assumes for the sake of this motion that they are.

of Education information technology and data systems related to student loan programs in order to audit those programs for waste, fraud, and abuse" is insufficiently particular to show that all six need unrestricted access to all of the systems they have been granted access, particularly without any information as to the actual duties of these six individuals. Allowing employees to define their needs and duties at such a high-level of generality would allow the statutory exception in section 552a(b)(1) to swallow the whole.

Other factors call the assertion of need into question, including the vast amount of data at issue. Moreover, the President himself has cast doubt on DOGE's need for the kinds of information it has been granted access to, stating that DOGE has no need for "every Americans personal information like social security numbers, home addresses bank accounts."[13] While that statement was, as Defendants note, not "specific to the issues here." ECF 16 at 35. But at this stage of proceedings and given the paucity of evidence Defendants have themselves offered up, the President's statement is probative.

Looking to the President's Executive Order establishing DOGE, Defendants inaccurately state that that document "provides that these individuals have a need to know '*all* unclassified agency records, software systems, and IT systems' to perform their duties."  ECF 16 at 35 (quoting 90 Fed. Reg. at 8442, § 4). That is not what the President's Executive Order says. Rather, the Executive Order directs that USDS be given access to those records and systems "to the maximum extent consistent with law. 90 Fed. Reg. at 8442. The Order does not serve as evidence that USDS has a "need" for any particular records, and by limiting access to "the maximum extent consistent with law," the President acknowledged and incorporated the

---

[13] Transcript, Press Conference: Donald Trump and Shigeru Ishiba of Japan Hold a Press Event, February 7, 2025, available at https://rollcall.com/factbase/trump/transcript/donald-trump-press-conference-shigeru-ishiba-japan-february-7-2025/.

nondisclosure provision of the Privacy Act, without expanding its exceptions.

### 3. The "routine use" exception does not apply.

Defendants' assertion that the routine use exception applies fares no better. "To invoke this exception, an agency must show (1) that notice of the asserted 'routine use' has been published in the Federal Register, along with the categories of users and the purpose of the use, [26 U.S.C.] § 552a(e)(4)(D); and (2) that the agency disclosed the record 'for a purpose which is compatible with the purpose for which that record was collected," *id.* § 552a(a)(7)." *Lugo v. DOJ*, 214 F. Supp. 3d 32, 39–40 (D.D.C. 2016). "[C]ourts in this district have required a fairly close relationship between the purpose for which a document was created and the purpose of its disclosure." *Richardson v. Bd. of Governors of the Fed. Rsrv. Sys.,* 248 F. Supp. 3d 91, 102 (D.D.C. 2017) (collecting cases) (subsequent history omitted). Here, Defendants have not addressed compatibility at all. Notably, Defendants have not addressed the purposes for which they actually *are* using the information at issue; instead, they have identified certain reasons why they might need this information. This distinction is important. While a "need" for certain information might allow an individual to access certain information under section 552a(b)(1), the routine use exception focuses on "uses" of information. If DOGE-affiliated individuals are using information in ways contrary to representations made to Plaintiff's members, even if those uses could fit into a broad "routine use" category, the exception does not apply. In other words, that there may be conceivable legitimate uses for given records does not mean that the actual uses fit the routine use exception. Given reports that DOGE staff are feeding sensitive ED data into private artificial intelligence software,[14] the Court should enjoin access to the records at issue until Defendants provide clarity as to how exactly they are using those records.

---

[14] *See, e.g.*, Natanson, et al., note __, *supra*.

**D.    Plaintiff is likely to show Defendants' action is contrary to the IRC.**

The IRC, 26 U.S.C. § 6103, generally prohibits the disclosure of tax return information without a taxpayer's consent, subject to specific exceptions. Defendants argue that exceptions contained in § 6103(l)(13) apply here. ECF 16 at 36. But those exceptions only allow disclosure to "authorized persons," which DOGE-affiliated individuals do not appear to be.

As with the Privacy Act, the wording of Ramada's declaration raises several concerns. Although not explicit, the declaration suggests that, at the least, the six "relevant employees" have been granted access to tax information, but that they "have thus far not accessed any tax-related information." ECF 16-1 ¶ 11. The Declaration does not say that the six individuals referenced are the *only* DOGE-affiliated individuals who have access to records covered by section 6103. For example, if Elon Musk had used ED's systems to access tax-related information, that would be entirely consistent with Ramada's declaration. Moreover, the fact that the relevant employees have not yet taken advantage of their access to tax-related information does not mean that Plaintiff is unlikely to succeed on its claim—it is ED's grant of access, not the specific act of accessing such information, that is challenged here.

Under 26 U.S.C. § 6103(*l*)(13)(A)–(D), information that is disclosed to ED by the Treasury Department for certain purposes may be used for specified purposes only by "an authorized person—someone who is (1) "an officer, employee, or contractor, of the Department of Education," *and* (2) "specifically authorized and designated by the Secretary of Education for purposes of [the specific exception] (applied separately with respect to each such subparagraph)." 26 U.S.C. § 6103(*l*)(13)(E)(i)–(ii). As discussed above, at least Ramada and the unidentified "USDS employee" are not ED employees. And no evidence suggests that they are "contractors." But more importantly, there is no evidence that *any* of the six individuals have received the specific authorization and/or designation required, and Defendants notably do not

suggest they have. *See* ECF 16 at 37. Therefore, at a minimum, the Court should restrain Defendants from continuing to allow individuals who are not "authorized persons" access to tax-related information until the requirements of § 6103(*l*)(13)(E)(ii) are satisfied.

**E.    Plaintiff is likely to show Defendants' action was arbitrary and capricious.**

In its opening memorandum, Plaintiff explained why Defendants' action in granting access was likely arbitrary and capricious—arguing that, among other things, Defendants "ignored the reliance and expectation interests that current and former students, their spouses, and parents have with respect to the privacy of the personal information they must share with ED to participate in programs created by Congress." ECF 9 at 29. Defendants have ignored this argument, mischaracterizing Plaintiff's arbitrary and capricious argument as based solely on ED's Privacy Act regulations. *See* ECF 16 at 37–38. Defendants offer no evidence, or any indication whatsoever, that they considered the impacts that opening up their data systems to DOGE would have on reliance interests—nor that they considered any other consequences on students, borrowers, and others. This strongly indicates a lack of reasoned decisionmaking.

**III.    The equities weigh in favor of Plaintiff.**

Intangible injuries like those that Plaintiff's members have suffered and will continue to suffer absent injunctive relief "qualify as irreparable harm, because such injuries generally lack an adequate legal remedy." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (citation omitted); *see also Reynolds v. Int'l Amateur Athletic Fed.*, 505 U.S. 1301. 1301 (1992) (Stevens, J., in chambers) (holding that intangible injury qualified as irreparable harm warranting preliminary injunction). Courts have frequently found that violations of privacy interests constitute such irreparable harm. *See*, *e.g.*, *United States v. Miami University*, 294 F.3d 797 (6th Cir. 2002) (finding harm associated with disclosure of student records constitutes irreparable harm). Additionally, if, as evidence shows is likely, students forego applying

financial aid or pursuing their education as a result of a chill caused by Defendants' actions, *see* Goodman Decl. ¶¶ 7–9; DeLucca Decl. ¶ 8, that harm is irreparable. Neither the Privacy Act nor the IRC provide relief for these injuries.

On the other side of the ledger, Defendants' have not identified any specific harm that would befall the government should a temporary restraining order issue. Generic invocations of Presidential policy choices are not enough—particularly to the extent they conflict with the policy choices expressed in our nation's duly-enacted laws.

## IV.    The scope of relief sought is appropriate.

Defendants argue that Plaintiff's proposed remedy is overbroad because it refers to the phrase "individuals affiliated with the so-called Department of Government Efficiency." ECF 16 at 39. While Plaintiff's have some idea based on public reporting, the certain identities of DOGE-affiliated individuals who have been granted access to ED's systems is solely within the Defendants' own knowledge. Should the Court be inclined to grant relief, the Court may require Defendants to provide that information, and any concerns about non-specificity can be ameliorated.

## CONCLUSION

For the foregoing reasons and those contained in their opening memorandum, Plaintiff respectfully requests that this Court grant its motion and enter a temporary restraining order enjoining Defendants from disclosing information about individuals to individuals affiliated with DOGE, and enjoining Defendants to retrieve and safeguard any such information that has already been obtained by and shared or transferred by DOGE or individuals associated with it.

Dated: February 13, 2025

Respectfully submitted,

/s/ Adam R. Pulver
Adam R. Pulver (DC Bar #1020475)
Nandan M. Joshi (DC Bar # 456750)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000


Daniel A. Zibel (DC Bar No. 491377)
Alexander S. Elson (DC Bar No. 1602459)
Tyler S. Ritchie
   (DC Bar No. 90018119)
National Student Legal Defense Network
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495