# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| University of California Student Association, <br><br> Plaintiff, <br><br> v. <br><br> Denise Carter, in her official capacity as Acting Secretary of Education, et al., <br><br> Defendants. | Civil Action No. 25-354 (RDM) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR EXPEDITED DISCOVERY

Daniel A. Zibel
(DC Bar No. 491377)
Alexander S. Elson
(DC Bar No. 1602459)
Tyler S. Ritchie
(DC Bar No. 90018119)
National Student Legal Defense Network
1701 Rhode Island Avenue NW
Washington, DC 20036
(202) 734-7495

Adam R. Pulver
(DC Bar No. 1020475)
Nandan M. Joshi
(DC Bar No. 456750)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

Dated: March 4, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 9

I.    Legal Standard ...................................................................................................... 9

II.   The Court Should Authorize Plaintiff to Serve Discovery on Defendants. ......................... 11

      A.   Whether a Preliminary-Injunction Motion is Pending .................................................. 12

      B.   The Purpose for Requesting Expedited Discovery ....................................................... 13

      C.   The Breadth of the Discovery Requests and the Burden on Defendants ...................... 16

      D.   How Far in Advance of the Typical Discovery Process the Request was Made .......... 17

CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

*4SIGHT Supply Chain Grp., LLC v. Kent*,
No. 2:19-cv-12476 (WHW) (CLW),
2019 WL 13235533, at *2 (D.N.J. June 27, 2019) ............................................................. 12

*Addala v. Renaud*,
No. 1:20-CV-2460-RCL, 2021 WL 244951 (D.D.C. Jan. 25, 2021). .................................. 11

*AFL-CIO v. Department of Labor*,
No. 25-cv-339-JDB (D.D.C. Feb. 27, 2025). ............................................................... passim

*America First Legal Foundation v. Cardona*,
630 F. Supp. 3d 170 (D.D.C. 2022) ................................................................................... 16

*American Federation of Teachers v. Bessent*,
No. DLB-25-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025). ............................................. 8

*Attkisson v. Holder*,
113 F. Supp. 3d 156 (D.D.C. 2015) .................................................................................... 11

*Crawford-El v. Britton*,
523 U.S. 574 (1998) ............................................................................................................ 10

*Florida v. United States*,
No. 3:21-cv-1066, 2022 WL 2431442 (N.D. Fla. June 6, 2022) ......................................... 10

*FW-CO, Inc. v. Schulz*,
No. 1:25-CV-00254-NYW-TPO, 2025 WL 588350 (D. Colo. Feb. 24, 2025) .................... 13

*Guttenberg v. Emery*,
26 F. Supp. 3d 88 (D.D.C. 2014) ................................................................................. 11, 13

*Hispanic Affairs Project v. Acosta*,
901 F.3d 378 (D.C. Cir. 2018) ........................................................................................... 10

*In re Fannie Mae Derivative Litigation*,
227 F.R.D. 142 (D.D.C. 2005). .......................................................................................... 11

*Judicial Watch, Inc. v. Department of Energy*,
412 F.3d 125 (D.C. Cir. 2005) ........................................................................................... 14

*Legal Technology Group, Inc. v. Mukerji*,
No. 17-cv-631 (RBW), 2017 WL 7279398 (D.D.C. June 5, 2017) .................................... 12

*Marshall County Health Care Authority v. Shalala*,
988 F.2d 1221 (D.C. Cir. 1993) ......................................................................................... 10

*McKoy v. Spencer*,
    271 F. Supp. 3d 25 (D.D.C. 2017)..................................................................... 16

*Missouri v. Biden*,
    No. 3:22-CV-01213, 2022 WL 2825846 (W.D. La. July 12, 2022)................................. 11

*National Law Center on Homelessness & Poverty v. U.S. Department of Veterans
    Affairs*,
    842 F. Supp. 2d 127 (D.D.C. 2012)..................................................................... 10

*National Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011)....................................................................... 11

*New Mexico v. Musk*,
    No. 1:25-cv-429-TSC (D.D.C. Feb. 17, 2025). ....................................................... 5

*Northwest Environmental Defense Center v. U.S. Army Corps of Engineers*,
    817 F. Supp. 2d 1290 (D. Or. 2011). .................................................................. 11

*Strike 3 Holdings, LLC v. Doe*,
    964 F.3d 1203 (D.C. Cir. 2020)........................................................................... 9

*Venetian Casino Resort, LLC v. EEOC*,
    409 F.3d 359 (D.C. Cir. 2005)........................................................................... 10

*Venetian Casino Resort, LLC v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008)........................................................................... 10

*Watts v. SEC*,
    482 F.3d 501 (D.C. Cir. 2007)........................................................................... 10

**STATUTES**

5 U.S.C. § 552a(b)(1)...................................................................................... 14

5 U.S.C. § 3161.............................................................................................. 3

**OTHER**

Courtney Dorning et al., *Former DOGE staffer explains her decision to quit*, NPR,
    Feb. 27, 2025, https://www.npr.org/2025/02/27/nx-s1-5309448/former-doge-
    staffer-explains-her-decision-to-quit ................................................................... 9

Danielle Douglas-Gabriel, *Consumer groups sue Trump administration over DOGE
    access*, Wash. Post, Feb. 7, 2025,
    https://www.washingtonpost.com/politics/2025/02/07/trump-presidency-
    news/#link AFIQUVHY3BF4VHB5UF7HS57W4E ......................................................... 15

Donald J. Trump, Address to the Economic Club of New York (Sept. 5, 2024),
    https://www.econclubny.org/documents/10184/109144/20240905_Trump_Trans
    cript.pdf ..................................................................................................... 4

Exec. Order No. 14158,
    90 Fed. Reg. 8441 (Jan. 29, 2025). .................................................................... 2, 3

Exec. Order No. 14170,
    90 Fed. Reg. 8621 (Jan. 30, 2025). ......................................................................... 4

Exec. Order No. 14210,
    90 Fed. Reg. 9669 (Feb. 14, 2025). ......................................................................... 4

Exec. Order No. 14219,
    90 Fed. Reg. 10583 (Feb. 25, 2025). ....................................................................... 4

Exec. Order No. 14222,
    90 Fed. Reg. 11095 (Mar. 3, 2025). ......................................................................... 4

Hiring Freeze, Memorandum,
    90 Fed. Reg. 8247 (Jan. 28, 2025). .......................................................................... 4

Fed. R. Civ. P. 26(b)(1) ..................................................................................................... 9

Fed. R. Civ. P. 26(d). ........................................................................................................ 9

Local Civil Rule 16.3(b)(1) ................................................................................................ 9

Lora Kolodny et al., *21 U.S. DOGE Service staffers resign over a refusal to
    'jeopardize Americans' sensitive data,' letter says*, NBC News, Feb. 25, 2025,
    https://www.nbcnews.com/politics/doge/21-doge-staffers-resign-saying-refuse-
    compromise-core-government-syste-rcna193622 .................................................... 9

Nicholas Nehamas et al., *A mystery solved: Amy Gleason, former health care
    executive, is running DOGE*, N.Y. Times, Feb. 25, 2025 ...................................... 5

*Remarks by President Trump at Future Investment Initiative Institute Priority
    Summit*, 2025 WL 560570 (Feb. 19, 2025) ........................................................... 5

## INTRODUCTION

Plaintiff University of California Student Association (UCSA) filed this action in response to credible reports that, for unauthorized purposes, and without compliance with preexisting security and data access policies, individuals affiliated with the United States DOGE Service had been granted access to sensitive personal and financial information that UCSA's members submitted to Defendant Department of Education (ED). UCSA's members submitted this personal information to ED for specific purposes and in reliance on ED's explicit representations as to the privacy protections that it would apply and the limited uses for which it would use that information. Plaintiff alleges that ED's decision to grant DOGE-affiliated individuals access to that information is contrary to law, exceeds statutory authority, and is arbitrary and capricious.

UCSA sought a temporary restraining order (TRO) to halt the ability of DOGE-affiliated individuals to access its members' sensitive personal information. In response, Defendants filed three declarations by two individuals purporting to demonstrate ED's compliance with law and rebut UCSA's showing of irreparable harm. Relying on assurances set forth in one of those declarations, the Court denied the TRO motion based on the lack of a clear showing of irreparable harm.

UCSA anticipates renewing its request for temporary relief by filing a motion for a preliminary injunction. But as this Court has already recognized, the record relating to both the merits of UCSA's claims and the injury that ED's disclosure of UCSA members' information remains, at best, incomplete. ED's skeletal, artfully worded declarations omit relevant facts as to the DOGE-affiliated personnel who have, and have had, access to UCSA members' records, the purposes for which that access has been authorized, how that access is being used, and with whom and under what precautions UCSA members' information is being shared. Since the Court's earlier ruling, information about DOGE and its activities continues to dribble into the public domain, and

1

calls into question some of the conclusions the Court previously made based upon the limited record before it.

The missing facts as to whom ED has granted access, for what purposes, and under what conditions are solely in Defendants' possession. Defendants cannot keep their actions secret to avoid meaningful judicial review, but that appears to be their strategy. Defendants have already indicated that they do not intend to compile and submit an administrative record, and that, in their view, no such record exists. While UCSA disagrees, even if Defendants did serve an administrative record as required by the Local Rules, that record of the decision to reverse policy and grant Executive Office employees direct access to individual financial aid and taxpayer information would not address how that access is being used—which is vital to the irreparable harm inquiry. The vague declarations submitted by ED provide no meaningful information either, but simply raise more questions. As Judge Bates concluded in a similar Administrative Procedure Act (APA) action involving different agencies' grants of access to sensitive records systems to DOGE-affiliated individuals, this presents an unusual situation where tailored, expedited discovery is not only appropriate, but "essential to decide plaintiffs' impending preliminary injunction motion." Order, *AFL-CIO v. Dep't of Labor*, No. 25-cv-339-JDB (D.D.C. Feb. 27, 2025), ECF 48. As in the *AFL-CIO* case, the limited factual discovery that UCSA seeks will provide the Court with a more complete record to assess the need for a preliminary injunction when that motion is briefed and will assist the Court's fact-finding function to assess the truth and reliability of the parties' representations and evidence.

## BACKGROUND

### *"Department of Government Efficiency"*

On the day of his inauguration, President Trump issued an executive order establishing a so-called "Department of Government Efficiency" (DOGE). Exec. Order 14158, 90 Fed. Reg.

8441 (Jan. 29, 2025). DOGE is not a single entity with a fixed structure or leadership. Under the executive order, the United States Digital Service was "publicly renamed" the "United States DOGE Service (USDS)" and "established" in the Executive Office of the President. *Id.* § 3(a). A "USDS Administrator," who reports to White House Chief of Staff Susan Wiles, was also "established" in the Executive Office of the President. *Id.* § 3(b). "[W]ithin USDS," the executive order establishes "the U.S. DOGE Service Temporary Organization" pursuant to 5 U.S.C. § 3161, which is to be led by the USDS Administrator and "dedicated to advancing the President's 18-month DOGE agenda." *Id.*

The executive order also directs agency heads to establish "a DOGE Team of at least four employees" at each agency. *Id.* § 3(c). Agency heads must consult with the USDS Administrator when selecting DOGE Team members and must "ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*

The executive order does not define the "DOGE Agenda," except to note that it is to be achieved "by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1. To that end, the executive order directs the USDS Administrator to "commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems" and directs the USDS Administrator to "work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a). Agency heads, in turn, must "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS

has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b).

Despite DOGE's supposedly technological focus, the President has delegated various other responsibilities to DOGE. *See* Exec. Order 14222, 90 Fed. Reg. 11095 (Mar. 3, 2025) (directing DOGE Team Leads to provide the USDS Administrator reports on agency contracting and travel); Exec. Order 14219, 90 Fed. Reg. 10583 (Feb. 25, 2025) (directing agency heads to coordinate with DOGE Team Leads on review of existing regulations); Exec. Order 14210, 90 Fed. Reg. 9669 (Feb. 14, 2025) (addressing "Workforce Optimization"); Exec. Order 14170, 90 Fed. Reg. 8621 (Jan. 30, 2025) (delegating to the "Administrator of the Department of Government Efficiency" (an undefined position) the duty to advise on a "hiring plan"); Hiring Freeze, Memorandum, 90 Fed. Reg. 8247 (Jan. 28, 2025) (requiring consultation with USDS Administrator on a workforce reduction plan). Alan Ramada, a USDS employee detailed to ED, has identified other responsibilities that the DOGE Team at ED has taken on: "auditing contract, grant, and related programs for waste, fraud, and abuse, including an audit of the Department of Education's federal student loan portfolio to ensure it is free from, among other things, fraud, duplication, and ineligible loan recipients" and helping "senior Department leadership obtain access to accurate data and data analytics to inform their policy decisions." ECF 16-1, ¶ 4.

DOGE's leadership structure and chain of command has remained murky. When DOGE was created, President Trump did not publicly announce the identity of the USDS Administrator, although he had long indicated that it would be led by entrepreneur Elon Musk.[1] On February 19, 2025, however, the government filed a declaration in court affirming that Mr. Musk is not an

---

[1] Donald J. Trump, Address to the Economic Club of New York (Sept. 5, 2024), https://www.econclubny.org/documents/10184/109144/20240905_Trump_Transcript.pdf.

employee of USDS or the U.S. DOGE Service Temporary Organization, and is not the USDS Administrator. *See New Mexico v. Musk*, No. 1:25-cv-429-TSC (D.D.C. Feb. 17, 2025), ECF 24-1. Two days later, however, President Trump stated publicly that he put Elon Musk "in charge" of DOGE.[2] Then, on February 25, 2025, the White House announced that Amy Gleason is serving as the acting USDS Administrator, although it is not known how long she has been serving in that role.[3]

### Proceedings to Date

1. UCSA, an association of over 230,000 current University of California undergraduate students, commenced this action on February 7, 2025. ECF 1. Citing public reporting, UCSA alleged that approximately 20 people affiliated with DOGE were working with ED, and that at least some of those individuals had "gained access to multiple sensitive internal systems … including a financial aid dataset that contains the personal information for millions of students enrolled in the federal student aid program." *Id.* ¶¶ 52–53 (citation omitted). UCSA further alleged, again citing public reporting, that DOGE-affiliated individuals were "feeding sensitive data from ED's systems into artificial intelligence systems maintained by third parties and subject to significant security risks." *Id.* ¶ 53. UCSA alleged that Defendants' action of granting access to sensitive information, including information provided by its members, exceeded Defendants' authority and violated the APA because it was contrary to the Privacy Act and the Internal Revenue Code and was arbitrary and capricious. *Id.* ¶¶ 58–70.

---

[2] *Remarks by President Trump at Future Investment Initiative Institute Priority Summit*, 2025 WL 560570, at *5 (Feb. 19, 2025).

[3] Nicholas Nehamas et al., *A mystery solved: Amy Gleason, former health care executive, is running DOGE*, N.Y. Times, Feb. 25, 2025.

**2.** Three days later, UCSA filed a motion for a temporary restraining order. ECF 9. In connection with that motion, UCSA pointed to additional publicly reported information about DOGE and its operations with respect to ED. *See id.* at 25–26. UCSA also noted widely held concerns of cyber security experts as to DOGE's access to and use of sensitive data, *id.* at 27, and provided evidence as to the impacts of ED's decision to grant DOGE access to students' records. *See* ECF 9-1–9-3, 17-2–17-4.

In connection with the TRO motion, the Court ordered the parties to "file a statement regarding what they anticipate including in the administrative record in this case." Text-Only Order (Feb. 11, 2025). In response, UCSA noted that Local Civil Rule 7(n) requires a certified list of the contents of the administrative record to be filed simultaneously with the filing of a dispositive motion, including a motion to dismiss. UCSA also explained that only Defendants had actual knowledge of the materials that comprise the administrative record before the agency at the time Defendants took the action that is at issue in this case. Nonetheless, UCSA suggested that the administrative record might include "(1) the appointments, hiring authority, and position descriptions of DOGE-affiliated individuals who were granted access to the ED records systems at issue; (2) the establishment and structure of such records systems; (3) the decision to, and manner in which, such access was granted to DOGE-affiliated individuals, including any 'DOGE Process Engagement Plan' (including records relating to the security and access procedures required by ED's SORNs and regulations); and (4) any records of access to those systems by DOGE-affiliated individuals." ECF 15, at 2–3 (footnote references omitted).

Defendants' response to the Court's order was that an administrative record was "not necessary" to resolve the jurisdictional defenses that they planned to raise in a motion to dismiss.

6

*Id.* at 3. But beyond that, Defendants contended that "there is no administrative record underlying the disputed issues" because, in their view, UCSA has not challenged final agency action. *Id.*

Subsequently, in opposing Plaintiff's TRO motion, Defendants produced three declarations by two individuals. Initially, Defendants submitted a single declaration from Mr. Ramada, a USDS employee detailed to ED. ECF 16. During the hearing on the TRO motion, this Court advised Defendants' counsel about the need for additional information from Defendants because "the party with the access to the evidence has some burden in the process" and that "there are some unsettled factual questions" that "we are going to have to get to the bottom of" whether through the "administrative record or whether it is discovery." Transcript of Feb. 14 Hearing, at 52, ECF 19.

After the Court's hearing on the TRO motion, Defendants submitted a supplemental declaration by Mr. Ramada and a declaration by Thomas Flagg. ECF 18.

**3.** On February 17, 2025, this Court denied the TRO motion, finding UCSA had not made a clear showing that its members would suffer irreparable harm as a result of permitting DOGE staffers to access their personal information on ED's systems. ECF 20. In reaching that conclusion, the Court relied heavily on assurances provided by Mr. Ramada.[4] Specifically, the Court noted that Mr. Ramada had attested that the DOGE members at ED understood that "they must comply with all applicable laws and regulations should they wish to share any information garnered during their work" and that "none of the information at issue has been shared with any other" individuals associated with DOGE—without making any representations as to other non-ED employees or as to future plans to share information. *Id.* at 11. The Court also relied on Mr. Ramada's assurances that the DOGE team at ED would not access "any tax-related information" without first obtaining

---

[4] The Court did not refer to Mr. Flagg's declaration in its opinion.

the "appropriate authorization" and would use such information "for purposes consistent with applicable law." *Id.* The Court noted that "ED and DOGE staffers are obligated to use UCSA members' information for lawful purposes within the mission of the Department of Education and to keep it confidential," and it concluded that none of the purposes Mr. Ramada had identified, auditing ED programs for waste, fraud, and abuse and identifying contracts and grants inconsistent with the administration's priorities, "should involve disclosure of any sensitive, personal information about any UCSA members." *Id.* at 12.

With respect to Defendants' challenge to UCSA's standing and whether UCSA had stated a claim, the Court noted that "[t]hose questions are less clear cut and are better answered on a more complete record." *Id.* at 9.

### Subsequent Events

On February 24, 2025, the U.S. District Court for the District of Maryland issued a TRO in a lawsuit filed against ED and other agencies concerning DOGE's access to records. *Am. Fed. of Teachers v. Bessent*, No. DLB-25-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025), ECF 38. The TRO bars ED from "disclosing the personally identifiable information of the plaintiffs and the members of the plaintiff organizations to any DOGE affiliates, including Adam Ramada and the five other individuals primarily working on the DOGE agenda at the Department of Education, until March 10, 2025 at 8:00 a.m." *Id.* at *15.

On February 25, 2025, 21 technology employees of the former U.S. Digital Service whose jobs were being "integrat[ed]" into DOGE's efforts resigned en masse, noting "DOGE's actions—firing technical experts, mishandling sensitive data, and breaking critical systems—contradict their stated mission of 'modernizing Federal technology and software to maximize governmental

efficiency and productivity.'"[5] As one of the resigning staffers explained, DOGE's activities created "a high risk of the American people's data being exposed or being utilized for nefarious means."[6]

## ARGUMENT

### I.    Legal standard

"Unless otherwise limited by court order, ...[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," including "the importance of the issues at stake in the action," "the parties' relative access to relevant information," "the importance of the discovery in resolving the issues," and "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). As a general rule, a "party may not seek discovery from any source before the parties have conferred" under Federal Rule of Civil Procedure 26(f). *Id.* 26(d)(1). Under this Court's local rules, however, the requirement to hold a Rule 26(f) conference does not apply to "an action for review on an administrative record." Local Civ. R. 16.3(b)(1). But district courts retain "broad discretion over the structure, timing, and scope of discovery." *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1208 (D.C. Cir. 2020); *see also* Fed. R. Civ. P. 26(d)(1) (permitting discovery prior to Rule 26(f) conference when authorized "by court order"). Thus, even in the context of APA claims, where the court's review is typically based on the administrative record rather than a record generated through discovery, a "district court is free to exercise its discretion

---

[5] Lora Kolodny et al., *21 U.S. DOGE Service staffers resign over a refusal to 'jeopardize Americans' sensitive data,' letter says*, NBC News (Feb. 25, 2025), https://www.nbcnews.com/politics/doge/21-doge-staffers-resign-saying-refuse-compromise-core-government-syste-rcna193622.

[6] Courtney Dorning et al., *Former DOGE staffer explains her decision to quit*, NPR, Feb. 27, 2025, https://www.npr.org/2025/02/27/nx-s1-5309448/former-doge-staffer-explains-her-decision-to-quit.

to permit further discovery 'to ascertain the contours of the precise policy'" under review. *Hispanic Aff's Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (quoting *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)). That includes the discretion "to tailor discovery narrowly and to dictate the sequence of discovery." *Watts v. SEC*, 482 F.3d 501, 507 (D.C. Cir. 2007) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)).

Judge Bates recently applied these principles in authorizing expedited discovery in a case involving DOGE Teams' access to sensitive information at the Departments of Labor and Health and Human Services and the Consumer Financial Protection Bureau. *AFL-CIO*, No. 25-cv-339-JDB, ECF 48. Even though that case, like this one, raised APA claims, Judge Bates recognized that the "agency action challenged here is unlike the actions normally challenged in APA cases, such as a promulgated regulation or a grant or denial of an application" because "plaintiffs challenge the agency defendants' 'policies' to 'grant [USDS] employees access to information systems,' which plaintiffs say amount to a new polic[y] of permitting unlawful disclosures of protected information." *Id*. at 5. A "key question" in the case is "'whether the alleged disclosure policy in fact exists,'" *id*. (quoting *Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 360 (D.C. Cir. 2005)), and the scope of that policy, which "also impacts the scope of the harm to plaintiffs." *Id*. In such cases, the court recognized that discovery "is appropriate, for it is not so much 'fact-finding' as it is 'filling in gaps …. to determine what the agency actually did.'" *Id*. at 6; *see also Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1227 (D.C. Cir. 1993); *Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431442, at *2 (N.D. Fla. June 6, 2022) ("[B]ecause Defendants deny the existence of the non-detention policy, [Plaintiff] cannot be constrained by an administrative record as to that alleged policy." (footnote omitted)) (order on motion to supplement administrative record); *Nat'l Law Ctr. on Homelessness & Poverty v. U.S.*

*Dep't of Veterans Aff's*, 842 F. Supp. 2d 127, 130–31 (D.D.C. 2012) (In an APA case "where no administrative record was ever filed ... plaintiffs would likely be entitled to some discovery to enable meaningful judicial review.").

"Courts may also consider extra-record evidence in determining whether a party will suffer irreparable harm in the absence of injunctive relief." *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300 (D. Or. 2011); *see also Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51 (D.D.C. 2011) (considering declaration in assessing irreparable harm). Indeed, "the need for a Preliminary Injunction would likely be thwarted if the Court were to wait for [ED] to provide an [administrative record] before determining whether discovery is necessary." *Missouri v. Biden*, No. 3:22-CV-01213, 2022 WL 2825846, at *6 (W.D. La. July 12, 2022) (subsequent history on other grounds omitted).

## II.    The Court Should Authorize Plaintiff to Serve Discovery on Defendants.

District courts in this circuit have adopted a "reasonableness" standard for determining whether to authorize expedited discovery in support of a preliminary-injunction motion. *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97 (D.D.C. 2014); *Addala v. Renaud*, No. 1:20-CV-2460-RCL, 2021 WL 244951, at *3 (D.D.C. Jan. 25, 2021). Under that standard, the Court "considers the 'reasonableness of the request in light of all of the surrounding circumstances,' which include: '(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.'" *Guttenberg*, 26 F. Supp. 3d at 97 (quoting *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 142–43 (D.D.C. 2005)); *see also Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015). These factors "provide 'guidelines for the exercise of the Court's discretion,'" but "[c]ourts are

not limited to these factors." *Attkisson*, 113 F. Supp. 3d at 162 (quoting *Guttenberg*, 26 F. Supp. 3d at 98).

Here, the reasonableness factors support the grant of UCSA's discovery motion.

### A.    Whether a Preliminary-Injunction Motion is Pending

UCSA has not yet filed a preliminary-injunction motion, but "that does not mean that this factor weighs in favor of denying plaintiff's motion." *AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 7. Garnering support for that anticipated preliminary-injunction motion is "the very purpose of [UCSA's] motion for expedited discovery." *Legal Tech. Grp., Inc. v. Mukerji*, No. 17-cv-631 (RBW), 2017 WL 7279398, at *3 (D.D.C. June 5, 2017). This Court denied UCSA's TRO motion on the ground that the record—consisting largely of declarations submitted by Mr. Ramada— failed to demonstrate a sufficient risk of irreparable harm to support the grant of emergency relief. In particular, the Court relied on Mr. Ramada's assurances that the DOGE Team at ED had lawful authority to access ED's records and that they would obey applicable law in the handling of personal information. ECF 20, at 11. In the context of the TRO motion, UCSA had no opportunity to engage in discovery to test Defendants' representations. Nonetheless, given that the preliminary-injunction standard also requires a showing of irreparable harm, the Court's decision makes it futile to seek a preliminary injunction absent an opportunity for further factual development.

As Judge Bates noted, courts typically prefer that a preliminary-injunction motion be filed so that the "parameters of relevant discovery" can be determined. *AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 7 (quoting *4SIGHT Supply Chain Grp., LLC v. Kent*, No. 2:19-cv-12476 (WHW) (CLW), 2019 WL 13235533, at *2 (D.N.J. June 27, 2019)). Here, however, litigation on the TRO motion has already "revealed the factual and legal issues critical to the impending preliminary injunction motion." *Id*. And UCSA has submitted the targeted, narrowly tailored discovery that it

seeks. Defendants, therefore, face no risk of being served with broad-ranging discovery requests if the Court were to grant UCSA's motion.

### B.    The Purpose for Requesting Expedited Discovery

Turning next to the third reasonableness factor, the purpose of seeking expedited discovery is to "reveal information related to the preliminary injunction" motion that UCSA anticipates filing. *Guttenberg*, 26 F. Supp. 3d at 98. Courts frequently grant expedited discovery to deal with asymmetries of information like those present here. *See, e.g.*, *FW-CO, Inc. v. Schulz*, No. 1:25-CV-00254-NYW-TPO, 2025 WL 588350, at *6 n.13 (D. Colo. Feb. 24, 2025) (noting expedited discovery might cure asymmetry of information as to how confidential information was being used). As with the plaintiffs in *AFL-CIO*, UCSA focuses its "discovery requests on the dispositive preliminary injunction issue of irreparable harm." *AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 8. Indeed, given that the Court denied the TRO motion precisely because it determined that the record did not support a sufficient risk of irreparable harm, USCA reasonably seeks discovery on that question before filing its request for preliminary relief.

The need for discovery is especially strong here because the Court relied on declarations that Defendant introduced at the TRO stage to deny UCSA's TRO motion. "It would be strange to permit defendants to submit evidence that addresses critical factual issues and proceed to rule on a preliminary injunction motion without permitting plaintiffs to explore those factual issues through very limited discovery." *AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 9. This Court has already recognized that the issues presented here will require the development of a more complete factual record. *See* Transcript of Feb. 14 Hearing, at 52, ECF 19; ECF 20, at 9.

For instance, the key assurances in the Ramada declarations on which the Court relied in denying a TRO were his assertion that the DOGE Team members at ED "understand that … they must comply with all applicable laws and regulations should they wish to share any information"

outside of ED, ECF 20, at 11 (quoting ECF 16-1, ¶ 16), or to access sensitive tax records, *id.* (citing ECF 16-1, ¶ 11). But exceptions to the disclosure bars in the Privacy Act and Internal Revenue Code turn on the question of whether the individuals to whom Defendants have granted access are employees of the ED. As Defendants have conceded, this question is answered by applying a multi-factor test. ECF 16, at 25 (citing *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131–32 (D.C. Cir. 2005)). Based on the sparse facts provided by Defendants thus far, it is not possible to determine whether Defendants granted access to individuals who do not satisfy this test. For example, Mr. Ramada says that he "spend[s] 50–60 hours per week working at Department [of Education] facilities." ECF 18-1, at ¶ 4. But the *location* at which Mr. Ramada is based says nothing about how much of his time is spent working on ED matters. Given the evidence that Mr. Ramada is concurrently detailed to other agencies—including Mr. Ramada's own sworn declaration in *AFL-CIO*, ECF 16-1, that he has been detailed to the Department of Labor, it seems likely that some of the "50–60 hours per week working *at*" ED's building is devoted to work related to other agencies. Plaintiff requires discovery to obtain greater clarity on this point, and other information as to the status of those DOGE-affiliated individuals who Defendants decided should receive access to the records at issue.

Moreover, the exceptions to the prohibitions on disclosure are tied to the question of an individual employee's "need to know," *see* 5 U.S.C. § 552a(b)(1), and/or for what specific purposes the individual is being given access to the information. Here, ED has inconsistently, and inadequately, explained why DOGE-affiliated individuals need access to the records at issue—and never said at all what it is doing with the information. Shortly after this lawsuit was filed, an ED spokesperson stated that DOGE's work at the Department "focused on return to in-person work, restoring accountability for employees who have policy-making authority, restoring accountability

for senior career executives, and reforming the federal hiring process to focus on merit."[7] But in his first declaration, Mr. Ramada identified different—and even broader—categories of work performed by DOGE-affiliated individuals—including "auditing contract, grant, and related programs for waste, fraud, and abuse," and "help[ing] senior Department leadership obtain access to accurate data and data analytics to inform their policy decisions at the Department." ECF 16-1, ¶ 4. Mr. Ramada's description of DOGE-related work at ED morphed again in his Supplemental Declaration, when he said that the Team's audits of contracts and grants was not limited to seeking out waste, fraud, and abuse, but also to identifying contracts and grants that are "inconsistent with leadership's policy priorities." ECF 18-2, ¶ 9. DOGE's charge from the President has also morphed over time, *see supra* pp. 3–4, creating even more ambiguity about the DOGE Team's mission at ED.

These broad, conflicting descriptions of DOGE's work at the Department make it impossible for Plaintiff, or the Court, to ascertain whether DOGE-affiliated individuals have a "need" to access the records at issue here, or whether those individuals' use of that data is a "routine use," and consequently, whether Defendants' decision to grant access to these individuals runs afoul of the Privacy Act. Even if audits for waste or abuse are permissible reasons to access the records at issue, for example, the identification of "contracts and grants that are … inconsistent with leadership's policy priorities," ECF 18-2, ¶ 9, does not generally fall into any of the statutory exceptions. Similarly, although the Ramada Declaration asserts that any access of tax information in ED's records will occur "with appropriate authorization and for purposes consistent with applicable law," ECF 16-1, ¶ 10, discovery is necessary to determine whether the access actually

---

[7] Danielle Douglas-Gabriel, *Consumer groups sue Trump administration over DOGE access*, Wash. Post (Feb. 7, 2025), https://www.washingtonpost.com/politics/2025/02/07/trump-presidency-news/#link AFIQUVHY3BF4VHB5UF7HS57W4E.

provided to the DOGE team is consistent with the limitations in the Internal Revenue Code. *Cf. Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 187 (D.D.C. 2022) (authorizing discovery in APA case where it was unclear whether an entity "w[ould] function as a group or a collection of individuals, an essential element of determining whether it is a [Federal Advisory Committee Act] advisory committee."); *McKoy v. Spencer*, 271 F. Supp. 3d 25, 37–38 (D.D.C. 2017) (recognizing that, in Privacy Act cases, discovery is necessary for the "determination of the applicability of the routine use exception").

### C.  The Breadth of the Discovery Requests and the Burden on Defendants

The second and fourth reasonableness factors consider the breadth of the discovery requests and the related question of the burden on defendants. Those factors point in favor of permitting limited discovery of information solely in Defendants' possession.

UCSA has submitted its proposed discovery requests with the Court concurrently with this motion. The discovery requests focus squarely on the "contours of the agencies' actions that are necessary for deciding a preliminary injunction motion, primarily irreparable harm." *AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 10. UCSA has proposed 7 interrogatories (plus subparts). The first two interrogatories, including six subparts, request basic information about the identities of the DOGE Team members given access to ED's systems and information relating to such access. Interrogatories 3 and 4 ask Interrogatories 5 and 6 address sharing of information. And the final interrogatory relates to Mr. Ramada's declaration about the trainings that the DOGE Team received. In short, the interrogatories seek information relating to who has been given access to sensitive information, how that information is being used and/or disseminated, and what precautions are being taken to minimize the risk of further unauthorized dissemination.

UCSA's proposed document requests and depositions are similarly limited in scope. Document requests 1 through 4, 8, and 10 are focused on the materials that define and explain the

16

nature of the access that ED's DOGE Team members have been granted to sensitive data on ED's systems. The remaining document requests are focused on the factual basis for specific statements that Mr. Ramada or Mr. Flagg made in their previous declarations. Similarly, UCSA proposes three depositions—one each of Mr. Ramada and Mr. Flagg and a Rule 30(b)(6) deposition—which would be time-limited to two and a half hours each, and cover the same limited set of topics as the proposed interrogatories and document requests.

Complying with these discovery requests should not be unduly burdensome on Defendants. Indeed, the vast majority of UCSA's proposed discovery asks for identities of the individuals who have been involved with the work of ED's DOGE Team and information that relates to topics that Defendants have already addressed in the declarations that they have filed with the Court. Particularly given the narrow time frame at issue in this litigation— "none of this information would require going back farther than January 20, 2025," *AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 13, and much of it would be even more recent—responding to UCSA's discovery requests would not pose an undue burden on Defendants.

### D.    How Far in Advance of the Typical Discovery Process the Request was Made

The fifth reasonableness factor concerns how far in advance of the typical discovery process the request is made. UCSA acknowledges that the possibility that Defendants may file a motion to dismiss that, if granted, might avoid the need for discovery is a factor that courts consider in deciding whether to permit expedited discovery. *AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 15. As Judge Bates noted, however, "[j]ust as this is not a run-of-the-mill APA case, this is not the standard civil case in which a motion to dismiss is filed before any legal or factual development." *Id*. As in *AFL-CIO*, the TRO litigation here has "produced a record, albeit minimal, and has revealed the parties' legal arguments" with respect to Defendants' purported bases for dismissal. *Id*. And, while noting that UCSA's standing theory is not "so implausible" to preclude

consideration of a motion for preliminary relief, this Court has already recognized that the question whether UCSA has "standing to sue and has stated a claim upon which relief may be granted" are "better answered on a more complete record." ECF 20, at 9; *see also AFL-CIO*, No. 25-cv-339-JDB, ECF 48, at 16 n.6 (noting that facts that relate to irreparable harm also are relevant to questions of "Article III standing and final agency action"). In these circumstances, the Court should not await a decision on a motion to dismiss before permitting UCSA to serve discovery on Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant this motion for expedited discovery and grant UCSA leave to serve the attached proposed discovery requests on Defendants.

Dated: March 4, 2025

Respectfully submitted,

/s/ Nandan M. Joshi
Nandan M. Joshi (DC Bar No. 456750)
Adam R. Pulver (DC Bar No. 1020475)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Daniel A. Zibel (DC Bar No. 491377)
Alexander S. Elson (DC Bar No. 1602459)
Tyler S. Ritchie (DC Bar No. 90018119)
National Student Legal Defense Network
1701 Rhode Island Avenue NW
Washington, DC 20036
(202) 734-7495